Kate Mueting (D.C. Bar No. 988177)
(*pro hac vice* application forthcoming)
kmueting@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5206

Charles Field (CA Bar No. 189817)
cfield@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
2550 Fifth Avenue, Suite 1100
San Diego, California 92103
Telephone: (619) 577-4252

Christopher Owens (MD Bar No. 220280004)
(*pro hac vice* application forthcoming)
cowens@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, Maryland 21202
Telephone: (410) 834-7422

*Attorneys for Plaintiff Courtney McMillian*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTHERN CALIFORNIA

| | |
|---|---|
| COURTNEY MCMILLIAN, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| X CORP., f/k/a/ TWITTER, INC., X HOLDINGS, ELON MUSK, Does, | |
| Defendants. | DEMAND FOR JURY TRIAL |

Case No. _____

COMPLAINT

1

# INTRODUCTION

1. Plaintiff Courtney McMillian, individually and on behalf of the Twitter Severance Plan (the "Twitter Severance Plan" or "Plan") and a class of participants and beneficiaries of the Plan, brings this action for the recovery of owed severance benefits pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

2. The Twitter Severance Plan is an ERISA employee welfare benefit plan that has been in effect since at least 2019. The Plan is documented in a detailed planning matrix ("the Matrix"), which details the compensation Twitter pays to terminated employees.

3. By operating a severance plan requiring ongoing maintenance and administration, Twitter Inc. ("Twitter") was operating an employee welfare benefit plan, as defined in 29 U.S.C. § 1002(1)(A).

4. The Plan fiduciaries include Twitter (and its successor company, X Corp.); Twitter CEO Elon Musk who managed the Plan, communicated about it, and exercised complete control and discretion over it; and the Doe Defendants, who also communicated with Plan participants about the Plan and, upon information and belief, exercised control and discretion over it.

5. Since October 27, 2022, when Mr. Musk took over Twitter, these fiduciaries violated their obligations to the Plan participants by failing to provide the benefits they were entitled to under the Plan. Additionally, the fiduciaries also violated their duty to disclose Plan information to Plan participants by failing to communicate and/or misrepresenting anticipated changes to the Plan.

# THE PARTIES

6. Plaintiff was a Plan participant and a Twitter employee from August 2020 through her separation date of January 4, 2023.

7. Defendant X Corp. is a Nevada corporation and the successor to Twitter, Inc., a Delaware corporation, by merger. X Corp. succeeded to all of Twitter, Inc.'s obligations upon the merger. Although Twitter, Inc. no longer exists as a corporate entity, because the events at issue in this complaint concern X Corp.'s operation of the social media platform and company known

Case No. _____

COMPLAINT
2

as Twitter, this complaint refers to Twitter rather than X Corp. Upon information and belief, X Corp. is headquartered at Twitter's former headquarters in San Francisco, California. X Corp. serves as sponsor, administrator, and fiduciary of the Plan. X Corp. is a wholly owned subsidiary of X Holdings.

8. Defendant X Holdings is a Nevada corporation and the successor to X Holdings I, Inc., which was created to facilitate the merger of X Corp. with Twitter by serving as the parent corporation to the acquisition subsidiary. X Holdings succeeded to all of X Holdings I's obligations, including its obligations under the Merger Agreement. This included the obligation to maintain and administer Twitter's severance Plan. Accordingly, X Holdings is a sponsor, administrator, and fiduciary of the Plan.

9. Defendant Elon Musk purchased Twitter in October 2022, at which point Mr. Musk began to exercise discretion and control over the Twitter Severance Plan and was thus a functional fiduciary of the Plan. Since his takeover, Mr. Musk has been the sole proprietor and CEO of Twitter.

10. Mr. Musk is personally liable for these violations as a fiduciary and also based on the unity of interest and ownership that exists between Mr. Musk and Twitter. Mr. Musk has substantially comingled his own assets and other businesses with Twitter. It has been widely reported that Mr. Musk has conscripted employees from his other companies, as well as friends and family, to do work at and for Twitter. Upon information and belief, Mr. Musk financed his purchase of Twitter largely through the sale of stock in his electric vehicle company, Tesla. Moreover, Twitter's current precarious financial state is the direct result of the inflated price that Mr. Musk offered for the company. Mr. Musk routinely uses his personal Twitter account to propose and announce changes in company policy, including hiring and firing decisions, and has described "Twitter 2.0" as "an Elon company" in official communications.

11. Because Plaintiff is currently unaware of the full scope of identities of the individuals who had fiduciary duties to Plan participants, those individuals (who may include formal employees or informal advisors to Mr. Musk) are collectively named as Defendants Does.

Case No. _____

Plaintiff will substitute the real names of Does when they become available to Plaintiff.

**JURISDICTION, VENUE, AND STANDING**

12. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. § 1132(a)(1)(B) and (3).

13. This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered and where at least one of the alleged breaches took place. It is also the District in which Defendants Twitter and X Holdings reside.

14. As a Plan participant, Plaintiff has standing to bring claims on behalf of the Plan pursuant to 29 U.S.C. §1132(a)(1)(B). Thus, Plaintiff brings this suit under §1132(a)(2) & (a)(3) in a representative capacity on behalf of all Plan participants.

15. Plaintiff has standing to bring claims on behalf of all participants in the Plan because the alleged harms to Plan participants can be traced to the same challenged conduct: the failure of Twitter to pay benefits due under the Plan to terminated employees. This singular conduct with respect to the Plan harmed each of the Plan participants.

**FIDUCIARY STANDARDS**

16. ERISA provides that in the absence of a designated plan "Administrator," the employer is an administrator and fiduciary. See ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

17. Twitter, as the employer of the severance Plan, was therefore an administrator and fiduciary of the Plan.

18. Additionally, ERISA provides that others who perform fiduciary functions are also fiduciaries. People are fiduciary to the extent they "exercise any discretionary authority or discretionary control respecting management of such plan" or have "any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii).

19. Each of the Defendants were fiduciaries with respect to the Plan and its participants to the extent that they exercised discretionary authority or control over the management of the Plan

Case No. _____

COMPLAINT

4

or were involved in its administration.

20. Mr. Musk and the Defendants made decisions about the size and availability of Plan disbursements, and which and how many employees would be eligible for them.

21. Mr. Musk and the Defendants communicated with employees about the availability of severance.

22. By virtue of these actions, as well as their roles within Twitter, Mr. Musk and the Doe Defendants exercised discretionary authority or control respecting the management, control, and administration of the Plan and its assets.

23. As set forth above, the Defendants acted in a fiduciary capacity with regards to the Plan: by administering the Plan, making decisions regarding employees' eligibility for benefits under the Plan, and communicating with employees about the Plan.

24. As set forth herein, the Defendants consistently violated these fiduciary duties in several ways.

25. These violations of fiduciary duties caused substantial harm to the Plan and its participants, by causing the Plan to be deprived of the funds necessary to make full payments to Plan participants.

26. Pursuant to 29 U.S.C. § 1132(a)(2), Plaintiffs seek to hold Defendants personally liable for the harm they suffered as a result of Defendants' breach of their fiduciary duties: namely, the unlawfully denied severance benefits.

## FACTUAL BACKGROUND

**A.     Twitter Maintained an ERISA Plan**

27. Since at least 2019, Twitter has maintained a severance plan for the purpose of providing employee participants with certain benefits in the event of unemployment, also known as an employee welfare benefit plan. *See* § 29 U.S.C 1002(1).

28. Twitter used the Matrix to plan and administer its severance policy. Upon information and belief, Twitter also used and created various templates and spreadsheets in the ongoing administration of the Plan.

29. To determine an employee's eligibility for severance, and the amount and type of severance, Twitter applied the Matrix, attached here as Appendix 1.

30. The Matrix was in effect for the entire duration of Plaintiff's employment with Twitter and was current as of October 2022, when Mr. Musk acquired the company.

31. Twitter's severance policy was a plan of ongoing administration, which Twitter updated according to new scenarios and contexts. The Matrix specifies that Twitter approved the Plan in 2019 and clarified it in 2020.

32. The Plan provided for six types of benefits, termed six Components: (i) base pay, or on-target earnings for sales employees; (ii) short-term incentives; (iii) long-term incentive equity; (iv) health benefits; (v) outplacement services; and (vi) bonuses.

33. Twitter determined the benefits each employee would receive using the Matrix, which considered the employee's role in the company; whether the employee's termination was due to performance issues, redundancy, or mutual agreement; whether the employee's termination triggered any legal risk to the company; base pay; geographical location; duration of service; pay grade; performance targets; health insurance elections; bonuses; start date; vested RSUs; and employee performance metrics.

34. Twitter's administration of the Plan required regular, ongoing expenses of company funds.

35. Upon information and belief, Twitter employees were broadly aware of the Plan and Twitter's consistent pattern and practice of offering severance to departing employees.

36. In addition, Twitter made sure all employees were aware of the Plan by publishing company-wide FAQs about the Plan in April, June, and October 2022. Twitter also sent a company-wide email in May 2022 informing employees of the Plan and detailing its contents.

**B.   Twitter and Mr. Musk Informed Plan Participants the Severance Plan Would Remain in Effect Post-Merger**

37. On April 25, 2022, Mr. Musk and Twitter announced they had entered into a Merger Agreement, under which Mr. Musk agreed to purchase Twitter. The merger was to close in October

Case No. _____

COMPLAINT

6

2022.

38.     Section 6.9 of the Merger Agreement provided that for one year following the closing of the merger, Twitter would continue to provide Plan participants with "Severance payments and benefits . . . no less favorable than" those provided under Twitter's policies immediately prior to the merger.

39.     The same day the Merger Agreement was announced, Twitter's then-CEO, Parag Agrawal and its then-Chairman Bret Taylor met with all Twitter employees and informed them that Twitter would continue to provide the severance Plan benefits for at least one year following the change in company ownership.

40.     In response to employee inquiries regarding the continued administration of the Plan, Twitter created, and Mr. Musk approved, a "Frequently Asked Questions," or "Acquisition FAQs" document, which the company first distributed to employees in April 2022.

41.     The company created updates to the FAQ, and these updates were distributed to employees in June and October of 2022. Mr. Musk also approved these FAQ updates.

42.     The Acquisition FAQs relied on the Merger Agreement and stated that "[t]he terms of the agreement specifically protect Tweep [Twitter employees] benefits, base salary, and bonus plans (short/long term incentive plans) so they cannot be negatively impacted for at least one year from the closing date." The FAQ specifically stated that, "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

43.     The Matrix provided the basis for the Acquisition FAQs: the Acquisition FAQs listed the Components in the Matrix and reiterated the factors that Twitter considers in administering the Plan.

44.     Mr. Musk also approved a company-wide email in May 2022 listing the Components contained in the Matrix, which it described as the "minimum" that went into an employee's severance package.

45.     As communicated to employees in this May 2022 email, the minimum included: two months base salary, prorated performance bonuses, cash value of any RSUs vesting within

three months of separation, and a cash contribution for continued healthcare coverage—just as described in the Matrix.

46. Mr. Musk and his team approved the FAQ communications and the May 2022 email, confirming Twitter's intention to continue providing Plan participants with Plan benefits.

47. Given the widespread skepticism of Mr. Musk's ability to operate Twitter successfully and the tightening of the tech labor market overall at the time, the parties to the Merger Agreement—Mr. Musk and the incoming leadership, as well as Twitter's outgoing management—knew that promising continued Plan benefits was necessary to prevent mass resignations that would threaten the viability of the merger deal and, potentially, of the company itself.

    **C.**    **Starting in October 2022 Defendants Failed to Pay the Promised Benefits to Plan Participants**

48. Mr. Musk assumed control of Twitter and the Plan in October 2022 and became a functional fiduciary.

49. Upon taking over Twitter on October 27, 2022, Mr. Musk dismissed Twitter's executive leadership and Board of Directors and became the sole director and CEO of the company.

50. With the assistance and input of the Doe Defendants, Mr. Musk immediately began planning widespread layoffs, which came in four rounds of cuts: one in November 2022, two in December 2022, and one in February 2023.

51. Upon information and belief, in the weeks prior to the November 4, 2022 layoffs, Mr. Musk and the Doe Defendants met with Twitter human resources officials to discuss the layoffs.

52. Upon information and belief, at these meetings, the Twitter human resources officials repeatedly told Mr. Musk and the Doe Defendants that laid-off employees would be eligible for severance under the Plan, and that Twitter was obligated to pay according to the Merger Agreement and the representations the Company had made in the Acquisition FAQs, which Mr. Musk had approved.

53. Upon information and belief, Mr. Musk and the Doe Defendants indicated that Mr. Musk did not intend for Twitter to follow the Plan's procedures or pay the Plan's promised severance, because of the expense involved.

54. At these meetings, Twitter, Mr. Musk, and/or the Doe Defendants exercised complete control over the Plan and the forthcoming severance to be offered to fired employees.

55. At no point did Twitter, Mr. Musk, the Doe Defendants, or anyone with control or discretion over the Plan inform employees of the anticipated changes to the severance Plan.

56. In fact, management communication with Plan participants had largely gone silent since Mr. Musk's takeover.

57. Whereas employees previously used Slack to inquire about company policies like the Plan, resulting in the Acquisition FAQs and company-wide email from management, employees now encountered the opposite of responsiveness and transparency.

58. Defendants occasionally shut down Twitter's Slack entirely, and, as has been publicly reported, Mr. Musk ordered his subordinates to comb through employees' Slack and Twitter accounts, including employees' personal Slack conversations with other employees. Twitter then fired employees who were found to have sent messages critical of Mr. Musk or his management decisions. According to public reporting, the result was hundreds of firings.

59. Plan participants were left in the dark regarding the severance benefits they had been repeatedly promised. It has been reported that Twitter told some Plan participants to view Mr. Musk's personal Twitter account or listen to a podcast hosted by Mr. Musk's friends for information about the layoffs and changes to company policies such as the Twitter Severance Plan.

60. On November 4, 2022, Twitter fired 3,700 employees, including Plaintiff McMillian.

61. On December 16 and 22, Twitter further laid off employees in its public policy and infrastructure teams.

62. On February 25, 2023, Twitter laid off an additional 200 employees, or 10% of its remaining workforce.

63. Upon information and belief, Twitter has terminated approximately 6,000 employees since Mr. Musk's takeover, reducing the Company's workforce from over 7,500 to around 1,300.

64. Defendants failed to pay any of these employees the promised severance benefits they were entitled to under the Plan. Despite the fact that all of the terminated employees were eligible for benefits under the Plan, Mr. Musk wrote on his Twitter account on November 4, 2022 that terminated employees were receiving "50% more than legally required."

65. Twitter offered the terminated employees at most three months of compensation: two months to comply with the notice requirements of the WARN Act, and then one month of severance pay.

66. Public reporting indicates that some laid-off employees have yet to receive anything.

67. Three months' severance is a fraction of what employees are entitled to as Plan participants. Upon information and belief, the terminated employees are entitled to no less than $500 million.

68. The Matrix states that for senior employees like Plaintiff, the base severance component will be six months' base pay plus one week for each full year of service. Less senior employees are entitled to two months' base pay plus one week for each full year of service.

69. In addition, all employees are entitled to their vested RSUs, bonuses, a cash contribution for health insurance, and three to six months of outplacement services.

## CLASS ACTION ALLEGATIONS

70. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

71. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiff seeks to certify this action as

a class action on behalf of all participants and beneficiaries of the Plan. Specifically, Plaintiff seeks to certify, and to be appointed as representative of, the following class:

>All participants and beneficiaries of the Plan who were terminated from Twitter since the date of Mr. Musk's takeover, October 27, 2022 through the date of judgment.

72. This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class includes thousands of members and is so large that joinder of all its members is impracticable.

b. There are numerous questions of law and fact common to this Class because the Defendants owed the same fiduciary duties to the Plan and to all participants and beneficiaries and took a common course of actions and omissions as alleged herein as to the Plan, and not as to any individual participant, that affected all Class members through their participation in the Plan in the same way. Thus, questions of law and fact common to the Class include, without limitation, the following: (i) whether Twitter's Plan is an employee welfare benefit plan as that term is defined in 29 U.S.C. § 1002; (ii) whether each of the Class members are entitled to benefits under the Plan such as gives rise to a claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(b) (iii) whether each of the Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); (iv) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by misleading Class members about their eligibility for severance and by denying Plan benefits to Plan participants; (v) whether Plaintiff's claims require similar inquiries and proof of the claims and therefore implicate the same set of concerns for all proposed members of the Class; and (vi) what Plan-wide equitable and other relief the Court should impose in light of the Defendants' breach of duties.

c. Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant during the Class Period and all participants in the Plan were harmed by Twitter's

misconduct.

d. Plaintiff is an adequate representative of the Class because she participated in the Plan during the Class Period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

e. There are no substantial individualized questions of law or fact among Class members on the merits of this Action.

73. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

74. Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because the Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

75. Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by some individual participants and beneficiaries may be small and it may be impracticable for all individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this

Case No. _____

matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

76. Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to the Defendants' liability to the Class for their allegedly disloyal conduct.

77. Plaintiff's counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## COUNT I
### Denial of Benefits
### ERISA § 502(a)(1)(B)

78. The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

79. The Twitter Severance Plan is a "welfare benefit plan" under ERISA and pursuant to the provisions of 29 U.S.C. § 1002(1) and 29 U.S.C. § 186(c)(6).

80. Twitter administered the Plan and served as a fiduciary. Beginning on October 27, 2022, Mr. Musk and the Doe Defendants began exercising discretion and control over the Plan and became a functional fiduciary.

81. Starting on October 27, 2022, Defendants failed to provide Plan participants with the promised benefits they were entitled to under the Plan.

82. Because the Plan does not provide formal appeal procedures, and because Defendants have not acknowledged that any severance Plan exists, it would be futile to pursue the exhaustion of any administrative remedies.

83. Lead Plaintiff and all members of the proposed class are therefore entitled "to recover benefits due to [them] under the terms of [the] plan." 29 U.S.C. § 1132(a)(1)(B).

84. As such, lead Plaintiff and all members of the proposed class are entitled to these benefits, plus pre- and post- judgment interest, costs, attorneys' fees, and penalties as authorized by 29 U.S.C. § 1132(g).

85. Defendants Musk and Twitter are liable under Count I. Mr. Musk is personally

Case No. _____

liable as a fiduciary and also due to the identity of interest between himself and Twitter/X Corp., a fiduciary and sponsor of the Plan.

## COUNT II
### Failure to Provide Complete and Accurate Information
### ERISA § 404(a)(1)

86. The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

87. The fiduciary duties imposed by ERISA Section § 404(a)(1) include a duty to communicate truthfully and accurately with plan participants and beneficiaries about the plan. This includes a duty not to mislead plan participants and beneficiaries about the plan and its benefits. It also includes a duty to inform plan participants when changes to a plan are under "serious consideration." *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180–82 (9th Cir. 2004). Relatedly, a fiduciary has an affirmative duty to disclose any information about a plan that would be harmful to withhold, in light of the fiduciary's knowledge about a participant's situation. *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995).

88. As alleged above, the Defendants communicated extensively with Twitter employees about upcoming layoffs, their eligibility for severance, and the amount and form that severance would take.

89. But with each communication, Defendants sought to mislead Plan participants about their eligibility.

90. Defendants approved the Acquisition FAQs sent to employees informing them of the Plan.

91. Upon information and belief, Mr. Musk and the Defendants had no intention of fulfilling these promises.

92. Even if Mr. Musk and the Defendants at some point believed they would fulfill these promises, by the first days of November 2022, they did not.

93. In meetings prior to the November 4 layoffs, Mr. Musk and the other individual Defendants were already planning to proceed with mass layoffs without abiding by the Plan.

Case No. _____

94. Yet Defendants made no efforts to disclose to Twitter employees that any changes to their severance Plan were under serious consideration.

95. Upon information and belief, employees asked the Defendants specifically about the Plan and their eligibility for severance at various times leading up to and following the four rounds of layoffs.

96. Upon information and belief, rather than truthfully and fully disclose the existence of the Plan to participants, the Defendants engaged in a campaign of obfuscation to hide the existence of the Plan; to mislead participants about the Plan's content and employees' eligibility for benefits under the Plan; and to mislead participants about the amount of benefits they were owed and would be offered.

97. Upon information and belief, rather than candidly respond to employee inquiries about the Plan or other work policies, Defendants instructed employees to view Mr. Musk's personal Twitter account and listen to episodes of the "All In" podcast, hosted by Jason Calacanis and David Sacks, two friends of Mr. Musk's who had contributed to Mr. Musk's purchase of Twitter and who were involved in the layoffs.

98. By directing employees to podcasts and Twitter accounts instead of providing information about the Plan, Defendants failed in their fiduciary duties to disclose information.

99. Upon information and belief, Twitter employees regularly asked Twitter management, including Doe Defendants, about severance, or otherwise sought information about the Plan.

100. Upon information and belief, at no point following Mr. Musk's acquisition of Twitter did Defendants affirm the existence of the Plan, its components, or employees' eligibility for benefits under it.

101. These statements were part of Mr. Musk's disloyal and dishonest strategy: to retain employees by promises of the Plan's severance and then deny the Plan's existence when the employees were fired.

102. These misrepresentations caused material harm to the Plaintiffs who relied on them,

in that employees received less severance than they were owed, and worked at Twitter longer than they would have otherwise had they known that Defendants' representations were false.

103. All Defendants are liable under Count II. Mr. Musk and the Doe Defendants are personally liable as fiduciaries of the Plan who misled, hid, or failed to disclose information about the Plan, including changes that were under serious consideration. Mr. Musk is further personally liable due to the identity of interest between himself and Twitter/X Corp., a fiduciary and sponsor of the Plan.

## COUNT III
### Liability Pursuant to ERISA §§405(a) and 503(a)(3)

104. The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

105. As alleged above, all Defendants were fiduciaries who failed to monitor other Plan fiduciaries.

106. ERISA § 405(a), 29 U.S.C. § 1105(a) imposes liability on a fiduciary for another fiduciary's breach of a duty with respect to a plan if he or she (i) knows of such a breach and fails to remedy it, (ii) knowingly participates in a breach, or (iii) enables a breach.

107. ERISA § 502(a)(3) imposes the same liability on non-fiduciaries.

108. Defendants knowingly participated and enabled Twitter's breach of its obligations under the Plan.

109. Defendants knowingly participated and enabled the campaign of deceit surrounding the Plan and its benefits.

110. To this day, Defendants have not done anything to remedy these breaches.

111. All Defendants are liable under Count III as co-fiduciaries, or as knowing participants in other Defendants' violations of fiduciary duties. Mr. Musk is further personally liable due to the identity of interest between himself and Twitter/X Corp., a fiduciary and sponsor of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief against Defendant as follows:

Case No. _____

COMPLAINT

16

Compliance with the Plan.

112. An Order compelling Twitter and Mr. Musk to abide by the terms of the Plan, the Matrix, the Acquisition FAQ, and the Merger Agreement for a period of one year from date of judgment.

113. An Order compelling Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan for a period of one year from date of judgment.

114. An Order enjoining Defendants from any further violations of ERISA, including their fiduciary duties prescribed therein.

115. Disgorgement of any excessive fees or amounts by which Defendants unjustly enriched themselves through the violations of their fiduciary duties.

116. Find and adjudge that Defendants Musk and Does are personally liable for losses to the Plan.

117. Attorney's fees and costs pursuant to ERISA § 502(g).

118. An Order compelling Defendants to provide the full terms of severance according to the Plan to all terminated employees from the date of Mr. Musk's takeover of the company to one year from the date of judgment, an amount that is no less than $500 million, plus pre-judgment and post-judgment interest at the maximum legal rate.

Counsel for Plaintiff demands a trial by jury.

DATED: July 12, 2023

Respectfully submitted,

Sanford Heisler Sharp, LLP

By: */s/ Kate Mueting*
Kate Mueting (D.C. Bar No. 988177)
(*pro hac vice* application forthcoming)
kmueting@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Ave SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5206

Charles Field (CA Bar No. 189817)
cfield@sanfordheisler.com

Case No. _____

COMPLAINT

17

**SANFORD HEISLER SHARP, LLP**
2550 Fifth Avenue, Suite 1100
San Diego, CA 92103
Telephone: (619) 577-4252

Christopher Owens (MD Bar No. 220280004)
(*pro hac vice* application forthcoming)
cowens@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, Maryland 21202
Telephone: (410) 834-7422

*Attorneys for Plaintiff Courtney McMillian*

Case No. _____
COMPLAINT
18

**CERTIFICATION OF CONFLICTS AND INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-15, the undersigned certifies that as of this date, there is no conflict or interest (other than the named parties) to report.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 12, 2023

/s/ *Kate Mueting*
Kate Mueting (D.C. Bar No. 988177)
(*pro hac vice* application forthcoming)
kmueting@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Ave SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5206

Case No. _____