Kate Mueting (D.C. Bar No. 988177)
*pro hac vice*
kmueting@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5206

Charles Field (CA Bar No. 189817)
cfield@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
2550 Fifth Avenue, Suite 1100
San Diego, California 92103
Telephone: (619) 577-4252

Christopher Owens (MD Bar No. 220280004)
*pro hac vice*
cowens@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, Maryland 21202
Telephone: (410) 834-7422

Samone Ijoma (MD Bar No. 2012170086)
(*pro hac vice* application forthcoming)
sijoma@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, Maryland 21202
Telephone: (410) 834-7420

Dacey Romberg (DC Bar No. 90003767)
(*pro hac vice* application forthcoming)
dromberg@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5219

*Attorneys for Plaintiffs Courtney McMillian and Ronald Cooper*

Case No.23-cv-03461-JCS

AMENDED COMPLAINT

1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTHERN CALIFORNIA**

| | |
|---|---|
| COURTNEY MCMILLIAN and RONALD COOPER, | Case No. 23-cv-03461-JCS |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| X CORP., f/k/a/ TWITTER, INC., X HOLDINGS, ELON MUSK, Does, | |
| Defendants. | DEMAND FOR JURY TRIAL |

## INTRODUCTION

1.      Plaintiffs Courtney McMillian and Ronald Cooper, individually, on behalf of the Twitter Severance Plan (the "Severance Plan" or "Plan") and on behalf of a class of similarly situated Plan participants and beneficiaries, bring this action for the recovery of owed severance benefits and relief from fiduciary violations pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

2.      Twitter Inc. ("Twitter")[1] maintained a policy and practice of paying regular severance benefits for many years. Since at least 2019, Twitter formalized this policy in several documents that provide a uniform and detailed policy framework for the numerous post-termination benefits Twitter provided to employees. *See* Docket 1-1. The administration of this plan was ongoing for many years and was effectuated by teams of employees from several departments within Twitter, as well as by contracts with third parties. By operating a severance

---

[1] Simultaneous to the events described in this complaint, Defendant X Corp, a wholly owned subsidiary of Defendant X Holdings, became successor in interest to the company formerly known as Twitter Inc. and assumed all of Twitter Inc.'s debts and obligations. The company and social media service formerly known as Twitter then changed its name to "X." For clarity and consistency, this complaint uses the name Twitter to describe the social media company and platform for which plaintiffs and class members worked.

plan requiring ongoing maintenance and administration, Twitter was operating an employee welfare benefit plan, as defined in 29 U.S.C. § 1002(1)(A).

3.      The Plan fiduciaries, as that term is defined in 29 U.S.C. § 1002(21)(A), include Twitter (and its successor company, X Corp., and its parent, X Holdings); Elon Musk who, as sole owner and CEO of Twitter during the events of this case, exercised complete control and discretion over the Plan, managed the Plan, and directed communications to employees about it. The Doe Defendants were also Plan fiduciaries as they communicated with Plan participants about the Plan and, upon information and belief, exercised control and discretion over it.

4.      As Defendant Musk assumed control of Twitter, he and other fiduciaries engaged in a campaign of deception towards employees regarding the existence of the Severance Plan and employees' eligibility for severance benefits. Without providing any notice to participants, and at times affirmatively misleading them, Defendant Musk and the other Defendants caused the Plan to be deprived of its funds and benefit components. When Defendant Musk and the other Defendants then began a course of mass terminations, Plan participants were wrongfully denied the benefits to which the Plan entitled them, and which Defendants had promised and were obligated to provide. The result of Defendants' conduct was the wrongful denial of benefits to participants; a Plan that had been disregarded, with benefits accruing to the company and Defendant Musk rather than participants.

**THE PARTIES**

5.      Plaintiff Courtney McMillian was a Plan participant and a Twitter employee from August 2020 through her separation date of January 4, 2023. Plaintiff McMillian was the Head of People Experience, and in this role she led Compensation, Benefits and other global functions. Plaintiff McMillian was informed of her termination on November 4, 2022.

6.      Plaintiff Ronald Cooper was a Plan participant and a Twitter employee from June 2021 through his separation date of April 28, 2023. Plaintiff Cooper was a Workplace Operations, Facilities, and People Manager. He worked in California and currently resides in California. Twitter did not formally notify Plaintiff Cooper of his termination before he was locked out of all

Case No.23-cv-03461-JCS

AMENDED COMPLAINT

3

Twitter systems on February 24, 2023.

7.    Defendant X Corp. is a Nevada corporation and the successor to Twitter, Inc., a Delaware corporation, by merger. X Corp. succeeded to all of Twitter, Inc.'s obligations upon the merger. Upon information and belief, X Corp. is headquartered at Twitter's former headquarters in San Francisco, California. X Corp. serves as sponsor, administrator, and fiduciary of the Plan. X Corp. is a wholly owned subsidiary of X Holdings.

8.    Defendant X Holdings is a Nevada corporation and the successor to X Holdings I, Inc., which facilitated the merger of X Corp. with Twitter by serving as the parent corporation to the acquisition subsidiary. X Holdings succeeded to all of X Holdings I's obligations, including its obligations under the Merger Agreement. This included the obligation to maintain and administer Twitter's Severance Plan. Accordingly, X Holdings is a sponsor, administrator, and fiduciary of the Plan.

9.    Ownership of Twitter was transferred to Defendant Elon Musk on October 27, 2022.

10.    As sole owner and CEO, Defendant Musk exercised discretion and control over the Twitter Severance Plan and was thus a functional fiduciary of the Plan.

11.    Because Plaintiffs are currently unaware of the full scope of identities of other individuals who had fiduciary duties to Plan participants, those individuals (who may include formal employees of Twitter or informal advisors to Defendant Musk) are collectively named as Defendants Does. Plaintiffs will substitute the real names of Does when they become available to Plaintiffs.

**JURISDICTION, VENUE, AND STANDING**

12.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(2), and 1132(a)(3).

13.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered and where

Case No.23-cv-03461-JCS

AMENDED COMPLAINT

4

1   at least one of the alleged breaches took place. It is also the District in which Defendants Twitter

2   and X Holdings reside.

3         14.    As Plan participants, Plaintiffs have standing to bring claims pursuant to 29 U.S.C.

4   § 1132(a)(1)(B) and in a representative capacity pursuant to Rule 23 of the Federal Rules of Civil

5   Procedure. Plaintiffs also bring this suit under 29 U.S.C. § 1132(a)(2) & (a)(3) in a representative

6   capacity on behalf of the Plan and all Plan participants.

7         15.    Plaintiffs have standing to bring claims on behalf of all participants in the Plan

8   because the alleged harms to Plan participants can be traced to the same challenged conduct:

9   refusal to pay benefits due under the Plan to terminated employees, Defendants' purposeful

10  mismanagement of the Plan, and Defendants' deceitful treatment of Plan participants.

11  **FIDUCIARY STANDARDS**

12        16.    ERISA provides that in the absence of a designated plan "Administrator," the

13  employer is an administrator and fiduciary. *See* 29 U.S.C. § 1002(16)(A); ERISA § 3(16)(A).

14        17.    Twitter, as the employer sponsor of the Severance Plan, was an administrator and

15  fiduciary of the Plan.

16        18.    ERISA also provides that individuals who perform fiduciary functions are

17  fiduciaries. People are fiduciaries to the extent they "exercise any discretionary authority or

18  discretionary control respecting management of such plan" or have "any discretionary authority or

19  discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii).

20        19.    Each of the Defendants were fiduciaries with respect to the Plan and its participants

21  because they exercised discretionary authority or control over the management of the Plan and/or

22  were involved in its administration.

23        20.    Defendant Musk and the other Defendants made decisions about the size and

24  availability of Plan disbursements, and which and how many employees would be eligible for

25  them.

26        21.    Defendant Musk and the other Defendants communicated with employees about

27  the availability of severance.

28

22.     By virtue of these actions, as well as their roles within Twitter, Defendant Musk and the Doe Defendants exercised discretionary authority or control respecting the management, control, and administration of the Plan and its assets.

23.     As set forth above, the Defendants acted in a fiduciary capacity with regards to the Plan: by administering the Plan, making decisions regarding employees' eligibility for benefits under the Plan, and communicating with employees about the Plan.

24.     As set forth herein, the Defendants violated their fiduciary duties in several ways.

25.     These violations of fiduciary duties caused substantial harm to the Plan and its participants, by causing the Plan to be deprived of the funds necessary to make full payments to Plan participants and by denying participants non-monetary transition services.

26.     Defendants are personally and jointly and severally liable for the harm to the Plan and to Plan participants that resulted from Defendants' breaches of their fiduciary duties.

## FACTUAL BACKGROUND

### A.     Twitter Maintained an ERISA Plan

27.     Since at least 2019, Twitter maintained a severance plan for the purpose of providing employee participants with certain benefits in the event of unemployment, also known as an employee welfare benefit plan. *See* 29 U.S.C § 1002(1)*.* This plan was detailed in company-created Plan documents, which represented the formalization of a longstanding company policy of providing post-termination benefits to departing employees.

28.     One of these Plan documents was a Plan Matrix, which Twitter used to determine an employee's eligibility for severance, and the amount and type of severance an eligible employee would receive.

29.     Whether an employee was eligible for severance and the amount and type of severance an eligible employe would receive was dependent on several factors, including the reason for the departure, an employee's tenure at the company, job level, department, restricted stock unit (RSU) issuance and price of RSUs at the time of departure, whether the employee's departure entailed any legal risk for the company, and other factors.

30.    The types of benefits included payments based on employee salary, tenure, job level, department, and reason for departure; a payment for health insurance continuation; pro-rated bonuses for certain types of employees; payments for RSUs; and outplacement services.

31.    Outplacement services to departing employees were provided through a third-party service provider. The duration of this service depended on an employee's level at the time of separation, as did Twitter's contribution for continued healthcare coverage.

32.    A further component of the Plan came in the form of a payout for Restricted Stock Units (RSUs) issued to employees as part of their compensation. Terminated employees were entitled to the value of any RSUs that vested according to their regular schedule for a period of three to six months following termination, depending on employee level. The value of each RSU was set according to an average price at the time of separation.

33.    Twitter tasked several Human Resource employees with applying the Matrix to departing employees. These employees created and used templates and spreadsheets to process claims for benefits under the Plan.

34.    Twitter employees from other departments were involved in applying the Matrix to departing employees, assessing their eligibility, applying the factors contained in the Matrix, and ensuring that the payments and services set forth in the Matrix were provided to departing employees.

35.    Internal procedures existed for amending the Plan and Matrix. These amendments required senior leadership approval and occurred numerous times since 2019.

36.    Twitter's administration of the Plan required regular, ongoing expenses of company funds.

37.    The Plan was in effect for the entire duration of Plaintiffs' employment with Twitter and was in effect as of October 2022, when Defendant  Musk acquired the company.

38.    In the days, weeks, and months before Defendant Musk's takeover, Twitter assured employees that the Plan benefits would continue and that employees who stayed on through the takeover would receive them in the event of layoffs. To this end, Twitter published company-wide

1  "Acquisition FAQs" about the Plan in April, June, and October 2022. Twitter also sent a company-

2  wide email in May 2022 informing employees of the Plan and its contents.

3     39.    Upon information and belief, Twitter executives made similar promises in

4  company-wide, all-hands meetings throughout this time.

5     **B.    Twitter and Defendant Musk Informed Plan Participants the Severance Plan**

6          **Would Remain in Effect Post-Merger**

7     40.    On April 25, 2022, Defendant Musk and Twitter announced they had entered into

8  a Merger Agreement, under which Defendant Musk agreed to purchase Twitter. The merger was

9  set to close in October 2022.

10    41.    Section 6.9 of the Merger Agreement provided that for one year following the

11  closing of the merger, Twitter would continue to provide Plan participants with "Severance

12  payments and benefits . . . no less favorable than" those provided under Twitter's policies

13  immediately prior to the merger.

14    42.    The same day the Merger Agreement was announced, Twitter's then-CEO, Parag

15  Agrawal and its then-Chairman Bret Taylor met with all Twitter employees and informed them

16  that the Merger Agreement required Twitter to continue to provide the Severance Plan benefits for

17  at least one year following the change in company ownership.

18    43.    These same promises were made publicly in a letter, also filed with the Securities

19  and Exchange Commission, to Twitter stockholders encouraging them to approve the Merger

20  Agreement.  Referring to "Twitter benefit plans," this document explained that "[d]uring the one

21  year period following the effective time of the merger, Parent [X Holdings] will, or will cause the

22  surviving corporation [X Corp.] or any of their affiliates to, provide severance payments and

23  benefits to each continuing employee that are no less favorable than those applicable to the

24  continuing employee immediately prior to the effective time of the merger under the existing

25  arrangements providing compensation or employee benefits." The letter also explained that any

26  vested RSUs would immediately convert into payments of $54.20—Defendant Musk's offer

27  price—while any unvested RSUs would convert "into the right to receive an amount in cash" equal

28

to Defendant Musk's offer price, which would "vest and be payable" according to the same schedule as applied immediately prior to the merger.

44.     In response to employee inquiries regarding the continued administration of the Plan, Twitter created the first "Acquisition FAQs document, which the company distributed to employees in April 2022."

45.     A senior Twitter executive informed Plaintiff McMillian that Defendant Musk approved the Acquisition FAQ and its distribution to employees.

46.     The company regularly updated the Acquisition FAQs document with information about the merger, including further details about and promises to continue Twitter's Severance Plan. These updates were distributed to employees with Defendant Musk's approval.

47.     The October 2022 Acquisition FAQs encouraged employees to rely on communications from the company and Defendant Musk for information about the merger and future company policy.

48.     The Acquisition FAQs expressly cited, quoted, and referred employees to Section 6.9 of the Merger Agreement, stating that it "provides special protection for Tweep [Twitter employees] compensation and benefits for one year following the close of the transaction." The Acquisition FAQs go on to state: "Specifically, the agreement specifically provides that, for one year following the closing of the transaction, the purchasing entity will . . . Provide continuing Tweeps whose employment [is] terminated during such period with severance payments and benefits that are no less favorable than those applicable to an applicable employee prior to the closing of the transaction." This language is the same as Section 6.9 of the Merger Agreement.

49.     The Acquisition FAQs also reinforced that Twitter employees would receive Plan benefits as detailed in Twitter's long-existing Severance Plan planning documents under the heading, "What is our general severance package if a position is eliminated?" The Acquisition FAQ update from October 24, 2022, states: "Generally speaking, in the event of a position elimination our current severance package includes . . . at least . . . two months base salary or On Target Earnings for employees on the Sales Incentive Plan; Pro-Rated Performance Bonus Plan

1   compensation at target; Cash value of equity that would have vested within three months from the

2   separation date; A cash contribution for health care continuation."

3          50.    A senior Twitter executive informed Plaintiff McMillian and others that Defendant

4   Musk had approved a similar description of the Plan and its constituent parts that was sent to

5   employees in a company-wide email.

6          51.    As communicated to employees in this email, from May 2022, the severance

7   components included: two months base salary, prorated performance bonuses, payment for any

8   RSUs vesting within three months of separation, and a cash contribution for continued healthcare

9   coverage. These components are the same as the severance package that would result from

10  application of Plan documents such as the Matrix.

11         52.    Given the widespread skepticism of Defendant Musk's ability to operate Twitter

12  successfully and the tightening of the tech labor market overall at the time, the parties to the Merger

13  Agreement—Defendant Musk and the incoming leadership, as well as Twitter's outgoing

14  management—knew that promising continued Plan benefits was necessary to prevent mass

15  resignations that would threaten the viability of the merger deal and, potentially, of the company

16  itself.

17  **C.     Starting in October 2022 Defendants Failed to Fund the Plan and Pay the**

18  **Promised Benefits to Plan Participants**

19         53.    Defendant Musk assumed control of Twitter and the Plan in October 2022.

20         54.    Upon taking over Twitter on October 27, 2022, Defendant Musk dismissed

21  Twitter's executive leadership and Board of Directors, and Defendant Musk became the sole

22  director and CEO of the company.

23         55.    With the assistance and input of the Doe Defendants, Defendant Musk immediately

24  began widespread layoffs, which came in four large rounds: one in November 2022, two in

25  December 2022, and one in February 2023, along with smaller mass firings that continue to this

26  day.

27

28

Case No.23-cv-03461-JCS

56.     Upon information and belief, in the weeks prior to the November 4, 2022, layoffs, Defendant Musk and the Doe Defendants met with Twitter human resources officials to discuss the layoffs.

57.     A senior Twitter executive told Plaintiff McMillian that Twitter human resource officials repeatedly told Defendant Musk and the Doe Defendants that (a) laid-off employees would be eligible for severance under the Plan and that (b) Twitter was obligated to pay the severance according to the Merger Agreement and the representations the company made in the Acquisition FAQs, all of which Defendant Musk had approved. At these meetings, Twitter (now X Corp.), Defendant Musk, and/or the Doe Defendants exercised complete control over the Plan and the forthcoming severance to be offered to fired employees.

58.     At no point did Twitter, Defendant Musk, the Doe Defendants, or anyone with control or discretion over the Plan inform employees of any anticipated changes to the Severance Plan.

59.     In fact, management communication with Plan participants had largely gone silent since Defendant Musk's takeover. Plan participants were left in the dark regarding the severance benefits they had been repeatedly promised.

60.     Public reporting suggests that, whereas prior to the merger Twitter would address employee questions about company policies (such as the Plan) raised via Slack, after the merger and around the time of impending layoffs, Defendants occasionally shut down Twitter's Slack entirely, to prevent potentially affected employees from seeking information and communicating among themselves about their benefits.

61.     Twitter also quietly shut down the email address employees could previously use for human resources inquiries.

62.     It has been reported that Twitter told some Plan participants to view Defendant Musk's personal Twitter account or listen to episodes of the "All In" podcast, hosted by Defendant Musk's friends Jason Calacanis and David Sacks, for information about the layoffs and changes to company policies such as the Twitter Severance Plan.

63.     As rumors of impending layoffs spread, Plaintiff Cooper asked his manager multiple times about layoffs and the availability of severance. On more than one occasion his manager informed him that someone from Human Resources would be reaching out to him. Human Resources did not reach out. Plaintiff Cooper continued to follow up as the layoffs unfolded, and after he was locked out of his work accounts in February 2023.

64.     After being locked out of his account, Plaintiff Cooper learned from other employees that Twitter created another email address to field inquiries from terminated employees. Plaintiff Cooper emailed this account. While he received an immediate auto-reply promising a response within 24 hours, no response came.

65.     At no point has Defendant Cooper received a response from management or Human Resources about the Plan or his eligibility for severance.

66.     On November 4, 2022, Twitter fired approximately 3,700 employees, including Plaintiff McMillian.

67.     On December 16 and 22, 2022, Twitter further laid off employees in its public policy and infrastructure teams.

68.     On February 25, 2023, Twitter laid off an additional approximately 200 employees, or 10% of its remaining workforce.

69.     On September 27, 2023, it was publicly reported that Twitter laid off around half of the Election Integrity Team.

70.     Upon information and belief, Twitter has terminated approximately 6,000 employees since Defendant Musk's takeover, reducing the company's workforce from more than 7,500 to around 1,300.

71.     Defendants failed to pay any of these employees the promised severance benefits they were entitled to under the Plan. Despite the fact that all of the terminated employees were eligible for benefits under the Plan, Defendant Musk wrote on his Twitter account on November 4, 2022 that terminated employees were receiving "50% more than legally required."

72.     In fact, Twitter offered the terminated employees one month of severance compensation. Defendant Musk appears to be referring to the two-month notice period required under the Worker Adjustment and Retraining Notification Act.

73.     The severance Twitter has offered to date is a fraction of what employees are entitled to as Plan participants. Upon information and belief, the terminated employees remain entitled to no less than $500 million.

74.     The base severance component under the Plan is six months' base pay plus one week for each full year of service for senior employees. Less senior employees are entitled to two months' base pay plus one week for each full year of service.

75.     In addition, all employees are entitled to their RSUs, bonuses, a cash contribution for health insurance, and three to six months of outplacement services.

76.     As a Level-8 employee with two years tenure at Twitter, Plaintiff McMillian was entitled to six-and-a-half months pay, a lump sum payment equal to the cost of six months of continuing health insurance coverage, six months of outplacement services, and the value of any RSUs that vested within six months of her termination, in addition to any bonuses, prorated to the time of termination.

77.     She was offered severance equal to one month of pay.

78.     Upon information and belief, Plaintiff Cooper was a Level-8 employee. If he were a Level-8 employee with one full year of service at Twitter, Plaintiff Cooper would be entitled to six months and one week of pay, a lump sum payment equal to the cost of six months of continuing health insurance coverage, six months of outplacement services, and the value of any RSUs that vested within six months of his termination, in addition to any bonuses, prorated to the time of termination.

79.     He was offered severance equal to one month of pay.

80.     Upon information and belief, Twitter did not provide any of the benefits owed under the Plan to any Plan participants pursuant to orders from Defendant Musk.

Case No.23-cv-03461-JCS

1

2                              **CLASS ACTION ALLEGATIONS**

3          81.     Section 1132(a)(1)(B) of Chapter 29 of the U.S. Code authorizes any participant or

4    beneficiary to bring an action to recover benefits due to him under the terms of the plan. Section

5    1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on

6    behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

7    Section 1132(a)(3) authorizes any participant or beneficiary to enjoin any act or practice that

8    violates any provision of ERISA or the terms of the plan or to obtain other appropriate equitable

9    relief to redress such violations or to enforce any provisions of ERISA or the terms of the plan.

10         82.     In acting in this representative capacity and to enhance the due process protections

11   of unnamed participants and beneficiaries of the Plan on behalf of the Plan under 29 U.S.C. §

12   1132(a)(2) and as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C.

13   § 1132(a)(1)(B) and (3), Plaintiffs seek to certify this action as a class action on behalf of all

14   participants and beneficiaries of the Plan. Specifically, Plaintiffs seek to certify, and to be

15   appointed as representatives of, the following class:

16

17                    All participants and beneficiaries of the Plan who were terminated from

18                    Twitter since the date of Defendant Musk's takeover, October 27, 2022,

19                    through the date of judgment.

20

21         83.     This action meets the requirements of Rule 23 and is certifiable as a class action for

22   the following reasons:

23         a.      The Class includes thousands of members and is so large that joinder of all its

24   members is impracticable.

25         b.      There are numerous questions of law and fact common to this Class because the

26   Defendants owed the same fiduciary duties to the Plan and to all participants and beneficiaries and

27   took a common course of actions and omissions as alleged herein as to the Plan, and not as to any

28

individual participant, that affected all Class members through their participation in the Plan in the same way. Thus, questions of law and fact common to the Class include, without limitation, the following: (i) whether Twitter's Severance Plan is an employee welfare benefit plan as that term is defined in 29 U.S.C. § 1002; (ii) whether each of the Class members are entitled to benefits under the Plan such as gives rise to a claim under 29 U.S.C. § 1132(a)(1)(b); (iii) whether each of the Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); (iv) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by misleading Class members about their eligibility for severance and by denying Plan benefits to Plan participants; (v) whether Plaintiffs' claims require similar inquiries and proof of the claims and therefore implicate the same set of concerns for all proposed members of the Class; and (vi) what Plan-wide equitable and other relief the Court should impose in light of the Defendants' breach of duties.

c.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the Class Period and all participants in the Plan were harmed by Defendants' misconduct.

d.     Plaintiffs are adequate representatives of the Class because they participated in the Plan during the Class Period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     There are no substantial individualized questions of law or fact among Class members on the merits of this Action.

84.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants in respect to the discharge of their fiduciary duties to participants and beneficiaries and to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties

1   to the adjudication or would substantially impair or impede those participants' and beneficiaries'

2   ability to protect their interests. Therefore, this action should be certified as a class action under

3   Rule 23(b)(1)(A) or (B).

4          85.     Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate

5   because the Defendants have acted or refused to act on grounds that apply generally to the Class,

6   so that final injunctive relief or corresponding declaratory relief is appropriate in respect to the

7   Class as a whole.

8          86.     Additionally, or in the alternative, this action may be certified as a class under Rule

9   23(b)(3). A class action is the superior method for the fair and efficient adjudication of this

10  controversy because joinder of all participants and beneficiaries is impracticable, the losses

11  suffered by some individual participants and beneficiaries may be small and it may be

12  impracticable for all individual members to enforce their rights through individual actions, and the

13  common questions of law and fact predominate over individual questions. Given the nature of the

14  allegations, no class member has an interest in individually controlling the prosecution of this

15  matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of

16  this matter as a class action.

17         87.     Additionally, or alternatively, this action may be certified as to particular issues

18  under Rule 23(c)(4), including but not limited to the Defendants' liability to the Class for their

19  disloyal conduct.

20         88.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and

21  is best able to represent the interests of the Class under Rule 23(g).

22                              **<u>COUNT I</u>**
                           **Denial of Benefits**
23                         **29 U.S.C. § 1132(a)(1)(B)**

24         89.     The allegations set forth in the preceding paragraphs are realleged and incorporated

25  herein by reference.

26         90.     The Twitter Severance Plan is a "welfare benefit plan" under ERISA and pursuant

27  to the provisions of 29 U.S.C. § 1002(1) and 29 U.S.C. § 186(c)(6).

28

91.     Twitter administered the Plan and served as a fiduciary. Beginning on October 27, 2022, Defendant Musk and the Doe Defendants began exercising discretion and control over the Plan and became functional fiduciaries.

92.     Starting on October 27, 2022, Defendants failed to provide Plan participants with the promised benefits they were entitled to under the Plan.

93.      Because the Plan does not provide formal appeal procedures, and because Defendants have not acknowledged that any severance Plan exists, it would be futile to pursue the exhaustion of any administrative remedies.

94.     Plaintiffs and all members of the proposed class are therefore entitled "to recover benefits due to [them] under the terms of [the] plan." 29 U.S.C. § 1132(a)(1)(B).

95.     As such, Plaintiffs and all members of the proposed class are entitled to these benefits, plus pre- and post- judgment interest, costs, attorneys' fees, and penalties as authorized by 29 U.S.C. § 1132(g).

96.     As the Plan sponsor and administrator, X Corp. (formerly Twitter) is liable under Count I.

97.     Defendant Musk is also personally liable due to the unity of interest and ownership that existed, and continues to exist, between Defendant Musk and Twitter.

98.     Defendant Musk has substantially commingled his own assets and other businesses with Twitter and repeatedly failed to observe the strictures of the corporate form.

99.     It has been widely reported that Defendant Musk has conscripted employees from his other companies, as well as friends and family, to do work at and for Twitter. This would enable Twitter to continue functioning despite mass layoffs without any risk of having to pay the severance benefits to the conscripted employees.

100.     According to public reports, Defendant Musk financed his purchase of Twitter in part through a billion-dollar loan from one of his other companies, SpaceX.

101.     According to public reports, Defendant Musk also financed his purchase of Twitter, and paid back his loan from SpaceX, by selling his stocks in another one of his companies, Tesla.

102.     Moreover, to the extent X Corp. finds itself in a state of financial precariousness and unable to meet its obligations to the Plan, it is the direct result of the debt Defendant Musk loaded on to the company through the inflated price that Defendant Musk offered for the company.

103.     By setting the purchase price and agreeing to the terms of the Merger Agreement, Defendant Musk also set the price for the RSU shares that were promised to terminated employees, but which he and the other Defendants now refuse to pay.

104.     For the Plan and Plan participants to be deprived of the full value of their promised severance, at prices Defendant Musk himself set, because of potential corporate insolvency that Defendant Musk himself caused, would be inequitable.

105.     Since October 2022, Defendant Musk was sole owner and CEO of Twitter, and acted with unchecked discretion and control over nearly every aspect of the company.

106.     According to publicly filed documents and his own representations, Defendant Musk purchased Twitter and took the company private primarily for personal and political reasons, including the views on free speech held by Defendant Musk and others close to him. Defendant Musk also failed to effectuate the Plan in the best interests of the Plan and Plan participants.

107.     Defendant Musk and Twitter publicly presented themselves as each other's alter egos: Defendant Musk routinely used his personal Twitter account to propose and announce changes in company policy, including hiring and firing decisions, and official Twitter communications described the company as "Twitter 2.0: an Elon company."

108.     Plaintiff McMillian was informed that the decision to deny employees' severance was made by Defendant Musk after Defendant Musk and the Doe Defendants reviewed the numbers on how much paying the severance would cost the company. It would be inequitable and unjust to prevent the Plan and Plan participants from recovering benefits and remedies from the person most responsible: Defendant Musk.

109.     Defendants are jointly and severally liable for the denial of benefits to Plan participants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II
**Breach of Fiduciary Duties by Failing to Fund the Plan**
**29 U.S.C. § 1132(a)(2)**

110.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

111.    The fiduciary duties imposed by 29 U.S.C. § 1104(a)(1)(A)(i) requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries."

112.    The Merger Agreement required Twitter and Defendants to pay benefits under the Severance Plan for one year from the date of Defendant Musk's purchase of Twitter.

113.    The Merger Agreement created an obligation that the Severance Plan be sufficiently funded to pay benefits to all participants who qualified for benefits under the terms of the Plan.

114.    Instead of fulfilling their obligations under the Plan and their fiduciary obligations to the Plan, Defendants secretly disemboweled the Plan and its components, leaving the Plan unable to make promised payments to participants.

115.    All Defendants are liable under Count II. Defendant Musk and the Doe Defendants are personally liable as fiduciaries of the Plan who failed to fund the Plan as required, instead likely diverting Plan funds to other company expenses to the detriment of participants and beneficiaries. Defendant Musk and Doe Defendants also made the decision to deny participants the outplacement services provided by the Plan, resulting in unnecessary expenses to the Plan. Defendant Musk is further personally liable due to the identity of interest between himself and Twitter, a fiduciary and sponsor of the Plan. Pursuant to these provisions, Defendants are jointly and severally liable for each other's violations.

1

2
3

**COUNT III**
**Breach of Fiduciary Duties by Failing to Provide Complete and Accurate**
**Information**
**29 U.S.C. § 1132(a)(3)**

4
5

116.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

6
7

117.    The fiduciary duties imposed by 29 U.S.C. § 1104(a)(1) include a duty to

8

communicate truthfully and accurately with plan participants and beneficiaries about the plan. This

9

includes a duty not to mislead plan participants and beneficiaries about the plan and its benefits. It

10

also includes a duty to inform plan participants when changes to a plan are under "serious

11

consideration." *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180–82 (9th Cir. 2004). Relatedly, a

12

fiduciary has an affirmative duty to disclose any information about a plan that would be harmful

13

to withhold, in light of the fiduciary's knowledge about a participant's situation. *Barker v. Am.*
*Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995).

14
15

118.    As alleged above, the Defendants communicated extensively with Twitter

16

employees about upcoming layoffs, their eligibility for severance, and the amount and form that severance would take.

17
18

119.    With each communication, Defendants misled Plan participants about their eligibility.

19
20

120.    Defendants approved the Acquisition FAQs sent to employees informing them of the Plan.

21
22

121.    In meetings prior to the November 4 layoffs, upon information and belief,

23

Defendant Musk and the other individual Defendants were planning to proceed with mass layoffs without abiding by the Plan.

24
25

122.    Yet Defendants made no efforts to disclose to Twitter employees that any changes to their severance Plan were under serious consideration.

26

27

28

Case No.23-cv-03461-JCS

123.   Plaintiff Cooper and, upon information and belief, other employees asked the Defendants specifically about the Plan and their eligibility for severance at various times leading up to and following the layoffs.

124.   However, Defendants engaged in a campaign of obfuscation to hide the existence of the Plan; to mislead participants about the Plan's content and employees' eligibility for benefits under the Plan; and to mislead participants about the amount of benefits they were owed and would be offered.

125.   Upon information and belief, rather than candidly respond to employee inquiries about the Plan or other work policies, Defendants instructed employees to view Defendant Musk's personal Twitter account and listen to episodes of the "All In" podcast.

126.   By directing employees to podcasts and Twitter accounts instead of providing information about the Plan, Defendants failed in their fiduciary duties to disclose information.

127.   Upon information and belief, at no point following Defendant Musk's acquisition of Twitter did Defendants affirm the existence of the Plan, its components, or employees' eligibility for benefits under it. Nor did any Defendants notify Plan participants that any changes were under serious consideration, even though Defendants knew that participants were expecting benefits under the Plan, as Defendants had previously promised them.

128.   These statements were part of Defendant Musk's disloyal and dishonest strategy: to retain employees by promises of the Plan's severance and then deny the Plan's existence when the employees were fired.

129.   These misrepresentations caused material harm to Plan participants. Employees received less severance than they were owed and were denied Plan benefits. Employees continued working at Twitter throughout the layoffs, understanding they would be eligible for severance benefits in the event of layoffs.

130.   Furthermore, Plaintiffs were irreparably harmed by being deprived of the Plan outplacement services designed to help employees recover professionally in the immediate aftermath of their termination.

131.    All Defendants are liable under Count III. Defendant Musk and the Doe Defendants are personally liable as fiduciaries of the Plan who misled, hid, or failed to disclose information about the Plan, including changes that were under serious consideration. Defendant Musk is further personally liable due to the identity of interest between himself and Twitter/X Corp., a fiduciary and sponsor of the Plan. Pursuant to these provisions, Defendants are jointly and severally liable for each other's violations.

### COUNT IV
### Liability Pursuant to 29 U.S.C. §§ 1105(a) and 1132(a)(3)

132.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

133.    As alleged above, all Defendants were fiduciaries who failed to monitor other Plan fiduciaries or non-fiduciaries who knowingly participated in the fiduciaries' breach of duties.

134.    Section 1105(a) of Chapter 29 of the U.S. Code imposes liability on a fiduciary for another fiduciary's breach of a duty with respect to a plan if he or she (i) knows of such a breach and fails to remedy it, (ii) knowingly participates in a breach, or (iii) enables a breach.

135.    Section 1132(a)(3) imposes the same liability on non-fiduciaries.

136.    Pursuant to these provisions, Defendants are jointly and severally liable for each other's violations.

137.    Defendants knowingly participated and enabled Twitter's breach of its obligations under the Plan.

138.    Defendants knowingly participated and enabled the campaign of deceit surrounding the Plan and its benefits.

139.    To this day, Defendants have not done anything to remedy these breaches.

140.    All Defendants are jointly and severally liable under Count IV as co-fiduciaries, or as knowing participants in other Defendants' violations of fiduciary duties. Defendant Musk is further personally liable due to the identity of interest between himself and Twitter, a fiduciary and sponsor of the Plan.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray for judgment and relief against Defendants as follows:

141.   An order Compelling Defendants to abide by the requirements of ERISA with respect to the Severance Plan;

142.   An Order compelling Defendants to abide by the terms of the Plan—as described in the Matrix, the Acquisition FAQ, and other relevant documents;

143.   An Order compelling Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan;

144.   An Order enjoining Defendants from any further violations of ERISA, including their fiduciary duties prescribed therein;

145.   An Order requiring Defendants to fund the Plan in an amount sufficient to pay benefits to Plan participants;

146.   Disgorgement of any excessive fees or amounts by which Defendants unjustly enriched themselves through the violations of their fiduciary duties;

147.   Find and adjudge that Defendants Musk and Does are personally liable for losses to the Plan;

148.   Attorneys' fees and costs pursuant to ERISA § 502(g);

149.   Service awards for the named Plaintiffs in recognition of the time, effort, and risk they incurred in bringing this action and as compensation for the value they have provided to the class members; and

150.   An Order compelling Defendants to provide the full terms of severance according to the Plan to all terminated employees from the date of Defendant Musk's takeover of the company to one year from the date of execution of the Merger Agreement, an amount that is no less than $500 million, plus pre-judgment and post-judgment interest at the maximum legal rate. Counsel for Plaintiffs demand a trial by jury.

DATED: October 13, 2023

Respectfully submitted,

Sanford Heisler Sharp, LLP

Kate Mueting

Kate Mueting (D.C. Bar No. 988177)
*pro hac vice*
kmueting@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Ave SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5206

Charles Field (CA Bar No. 189817)
cfield@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
2550 Fifth Avenue, Suite 1100
San Diego, CA 92103
Telephone: (619) 577-4252

Christopher Owens (MD Bar No. 220280004)
*pro hac vice*
cowens@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, Maryland 21202
Telephone: (410) 834-7422

Samone Ijoma (MD Bar No. 2012170086)
(*pro hac vice* application forthcoming)
sijoma@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, Maryland 21202
Telephone: (410) 834-7420

Dacey Romberg (DC Bar No. 90003767)
(*pro hac vice* application forthcoming)
dromberg@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5219


*Attorneys for Plaintiff Courtney McMillian,*
*Plaintiff Ronald Cooper, and the Class*

1  **<u>CERTIFICATION OF CONFLICTS AND INTERESTED ENTITIES OR PERSONS</u>**

2      Pursuant to Civil L.R. 3-15, the undersigned certifies that as of this date, there is no

3  conflict or interest (other than the named parties) to report.

4      I certify under penalty of perjury under the laws of the United States of America that the

5  foregoing is true and correct.

6

7  Dated: October 13, 2023

Kate Mueting (D.C. Bar No. 988177)
*pro hac vice*
kmueting@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Ave SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5206