Kate Mueting, DC Bar No. 988177*
Dacey Romberg, DC Bar No. 90003767*
Samone Ijoma, MD Bar No. 2012170086*
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5206
kmueting@sanfordheisler.com
dromberg@sanfordheisler.com
sijoma@sanfordheisler.com

Charles Field, CA Bar No. 189817
**SANFORD HEISLER SHARP, LLP**
7911 Herschel Avenue, Suite 300
La Jolla, CA 92037
Telephone: (619) 577-4252
cfield@sanfordheisler.com

Kristi Stahnke McGregor, GA Bar No. 674012*
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7008
kmcgregor@sanfordheisler.com

Christopher Owens, MD Bar No. 2202280004*
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, MD 21202
Telephone: (410) 834-7422
cowens@sanfordheisler.com

*Attorneys for Plaintiffs
and the Potential Class*

* admitted *pro hac vice*

Case No. 3:23-cv-03461-TLT-RMI-SK

**PLAINTIFFS' NOTICE OF APPEAL TO THE
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

1

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTHERN CALIFORNIA**
**SAN FRANCISCO DIVISION**

9

10

11

| | |
|---|---|
| COURTNEY MCMILLIAN and RONALD COOPER, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>X CORP., f/k/a/ TWITTER, INC.,<br>X HOLDINGS, ELON MUSK, DOES,<br><br>        Defendants. | Case No. 3:23-cv-03461-TLT-RMI-SK<br><br>**PLAINTIFFS' NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**<br><br>Judge: Trina L. Thompson<br>Magistrate Judge (Discovery):<br>Robert Illman<br>Magistrate Judge (Settlement):<br>Sallie Kim |

12

13

14

15

16

17

18

19

20

Notice is hereby given that Plaintiffs COURTNEY MCMILLIAN and RONALD COOPER, on

21

behalf of themselves and the potential class, appeal to the United States Court of Appeals for the

22

Ninth Circuit from:

23

    (1) "Judgment" (ECF No. 106), entered by the U.S. District Court on July 31, 2024; and

24

    (2) "Order Granting Request for Judicial Notice and Granting Motion to Dismiss" (ECF

25

        No. 97), entered by the U.S. District Court on July 9, 2024.

26

27

28

Case No. 3:23-cv-03461-TLT-RMI-SK

1    True copies of the above-mentioned documents are attached as Exhibit A

2  ("Judgment") and Exhibit B ("Order").

3  DATED: August 14, 2024                          Respectfully submitted,

4                                                  Sanford Heisler Sharp, LLP

5                                                  By: */s/ Kate Mueting*

6                                                  Kate Mueting, DC Bar No. 988177
                                                   (admitted *pro hac vice*)

7                                                  **SANFORD HEISLER SHARP, LLP**
                                                   700 Pennsylvania Avenue SE, Suite 300

8                                                  Washington, DC 20003
                                                   Telephone: (202) 499-5206

9                                                  kmueting@sanfordheisler.com

10

11                                                 *Attorney for Plaintiffs*
                                                   *and the Potential Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                           Case No. 3:23-cv-03461-TLT-RMI-SK

**PLAINTIFFS' NOTICE OF APPEAL TO THE**
**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

3

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COURTNEY MCMILLIAN, et al.,<br><br>        Plaintiffs,<br><br>     v.<br><br>ELON MUSK, et al.,<br><br>        Defendants. | Case No. 23-cv-03461-TLT<br><br>**JUDGMENT**<br>Re: Dkt. No. 100 |

On July 9, 2024, the Court granted the Defendant's Request for Judicial Notice and Motion to Dismiss with leave to amend the First Amended Complaint, but only as to the claims that are not governed by ERISA.  ECF 97.

Plaintiff filed a written notice of intent not to file an amended complaint.  Per Plaintiff's request and pursuant to Federal Rule of Civil Procedure 12(b)(6) and 29 U.S.C §1132(a)(1)(B), the Court hereby ENTERS judgment in favor of Defendant and against Plaintiff. ECF 100.

The Clerk of Court shall close the file in this matter.

**IT IS SO ORDERED.**

Dated: July 31, 2024

_____
TRINA L. THOMPSON
United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COURTNEY MCMILLIAN, et al.,

          Plaintiffs,

    v.

ELON MUSK, et al.,

          Defendants.

Case No. 23-cv-03461-TLT

**ORDER GRANTING REQUEST FOR JUDICIAL NOTICE AND GRANTING MOTION TO DISMISS**

Re: ECF Nos. 38 and 47

## I.     INTRODUCTION

Plaintiffs Courtney McMillian and Ronald Cooper bring this putative class action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*  Plaintiffs claim that their former employer, Twitter, Inc. ("Twitter"), now X Corp, provided insufficient severance payments under a post-termination benefits plan that applies to former Twitter employees due to Twitter's takeover in October 2022 (aka "the severance plan" or "the plan").[1] Plaintiffs claim that after the takeover they were only offered one months' worth of severance pay but are entitled to a higher amount under the plan.  As a result, Plaintiffs seek relief for (1) wrongful denial of benefits under an ERISA plan; (2) breach of fiduciary duties imposed by ERISA for failure to fund plan; and (3) failure to provide complete and accurate information about an ERISA plan.  The class is defined as "[a]ll participants and beneficiaries of the Plan who were terminated from Twitter since the date of Defendant Musk's takeover, October 27, 2022, through the date of judgment."  ECF No. 13 (First Amended Complaint ("FAC")) ¶ 82.

---

[1]     Twitter was purchased by Elon Musk on October 27, 2022.  ECF No. 13 (FAC) ¶ 54.  In March 2023 Twitter and X Corp merged.  ECF No. 38 (Motion to Dismiss FAC), at 8:26.  Therefore, this Order will use the terms "Twitter" and "X Corp" interchangeably to mean the same entity unless otherwise indicated.

United States District Court
Northern District of California

United States District Court
Northern District of California

McMillian's class action is one of multiple lawsuits filed by former Twitter employees relating to the 2022 restructuring of Twitter and subsequent layoffs. For example, on November 3, 2022, *Cornet v. Twitter, Inc.* was filed amidst ongoing layoffs at Twitter. No. 22-cv-06857-JD, 2022 WL 18396334, at *1 (N.D. Cal. Dec. 14, 2022). About four months after the second amended complaint was filed in *Cornet*, *Cornet* was transferred from the Northern District of California to the District of Delaware and assigned Case No. 23-cv-00441-JLH, transfer date April 20, 2024.

The *Cornet* plaintiffs assert contract-based claims for severance benefits on behalf of a nationwide putative class of X Corp employees and former employees that had been promised that "if there were layoffs, employees would receive benefits and severance at least as favorable as the benefits and severance that Twitter previously provided to employees." *See id.*, ECF No. 40 (Second Amended Complaint ("SAC")) ¶ 27 filed in *Cornet*, No. 23-cv-00441-JLH. Both this action and the *Cornet* action concern Twitter's deficient severance payments following mass layoffs in November 2022, December 2022, February 2023, and September 2023 after Twitter was purchased in October 2022. ECF No. 13 (FAC) ¶¶ 55, 66, 67, 68, and 69.[2]

---

[2]    Other lawsuits relating to severance reported by Plaintiffs are:

*Arnold et al v. X Corp. et al*, No. 23-cv-00528-JLH-CJB (D. Del. May 16, 2023) (Six relatively senior former Twitter employees brought an action against X Corp / Twitter alleging fourteen causes of action (none under ERISA) based on, *inter alia*, X Corp's failure to pay contractual required severance under the terms of the Merger Agreement);

*Agrawal et al v. Musk et al*, No. 24-cv-01304-MMC (N.D. Cal. Mar. 3, 2024) (Four high level former Twitter executives brought an ERISA action against Twitter / X Corp and other defendants based on the failure to provide benefits to them under the "Twitter, Inc. Change of Control and Involuntary Termination Protection Policy plan, as amended and restated effective August 8, 2014…". And under "Twitter, Inc. Change of Control Severance and Involuntary Termination Protection Policy, as amended and restated, effective February 22, 2017", as these "Twitter[ ] severance plans provided its senior executives with severance benefits equal to one year's salary plus unvested stock awards valued at the acquisition price in the event their employment was negatively affected by a change in control." ECF No. 58 ¶¶ 10-13, 33, 37 filed in *Agrawal*. The parties in *Agrawal* do not dispute the 2014 and 2017 plans are governed by ERISA. The hearing on the Motion to Dismiss Count V of the *Agrawal* complaint (count relating to equitable surcharge and front pay) is set for July 19, 2024, before Hon. Maxine Chesney. *See generally* Docket in *Agrawal*);

*Ma v. Twitter, Inc. et al*, 23-cv-03301-JST (N.D. Cal. June 20, 2023) (breach of contract and promissory estoppel claims brought by Plaintiff Schobinger on behalf of a putative class composed of former Twitter employees throughout the United States who signed arbitration

United States District Court
Northern District of California

The putative classes in both actions are composed of former Twitter employees who left the company starting in late 2022 following Twitter's acquisition.  ECF No. 35 (Opposition to Plaintiffs' Motion for Notice of Action), at 2:22-24.  Defendants claim the putative class members in both lawsuits, *Cornet* and this one, will thus be virtually identical.  Plaintiffs respond by claiming that the two actions are not identical.  For instance, Plaintiffs point out that, among other things, there are putative class members that live out of this country and this action is brought solely under ERISA.  *See* ECF No. 41 (Reply in Support of Plaintiffs' Motion for Notice of Suit), at 6:10-19.  Here, each claim is predicated on the existence of provisions in an ERISA governed plan that are supposed to apply to laid off employees after Twitter's takeover in October 2022.  So, if there are insufficient facts alleged in the complaint to support ERISA governing this 2022 severance plan, then the Defendants' Motion to Dismiss must be granted.

## II.    BACKGROUND

Defendant Twitter is a social media company and online platform.  Plaintiffs McMillian and Cooper, along with the putative class members, were employed by Twitter before their

---

agreements to resolve their claim that Twitter breached promises to pay them their annual performance bonuses for 2022 if they chose to stay with Twitter; Motion for Class Certification hearing set for August 22, 2024 before Hon. Jon. S. Tigar);

*Rosa v. X Corp. et al*, 23-cv-22908-BRM-AME (D.N.J. Dec. 5, 2023) (complaint brought by former employee of Twitter after Twitter did not pay the arbitration fee so plaintiff could not arbitrate claims for breach of contract, breach of the duty of good faith and fair dealing, unlawful termination in violation of New Jersey Conscientious Employee Protection Act, retaliation, violations of New York's and California's Labor Code, wrongful termination in violation of public policy, and violation of the federal, California, and New York WARN Acts);

*Schobinger v. Twitter, Inc. et al*, 23-cv-03007-VC (N.D. Cal. June 20, 2023) (breach of contract and promissory estoppel claims brought by Plaintiff Schobinger as an individual and on behalf of other current and former Twitter employees who were employed by the Company as of January 1, 2023, and who have not been paid their annual bonus for 2022); and

*Woodfield v. Twitter, Inc. et al*, 23-cv-00780-JLH (D.Del. Jul. 18, 2023) (breach of Dispute Resolution Agreement action brought by Plaintiff as a class action).  ECF No. 75 (Response re ECF No. 65), at 8 filed in *McMillian*.  *Cornet*, No. 23-cv-00441-JLH, *Arnold*, No. 23-cv-00528-JLH-CJB, and *Woodfield*, No. 23-cv-0780-JLH are related on the dockets for these cases.

Lawsuits relating to wages and discrimination include: *Rodriguez v. Twitter, Inc.*, 22-cv-07222-JD (N.D. Cal. Nov. 16, 2022); *Gadala v. Twitter, Inc. et al*, 23-cv-01595-JSC (N.D. Cal. Apr. 4, 2023); *Adler v. Twitter, Inc.*, 23-cv-01788-JD (N.D. Cal. Apr. 13, 2023); *Weber v. X Corp et al*, 23-cv-00233 (E.D. Wash. Aug. 17, 2023); *Frederick-Osborn v. Twitter, Inc. et al*, 24-cv-00125-JSC (N.D. Cal. Jan. 5, 2024).

3

United States District Court
Northern District of California

employment was terminated due to the takeover layoffs. *Id.* ¶ 2. Defendant X Corp is successor in interest to Twitter. After the March 2023 merger, X Corp assumed all of Twitter's debts and obligations. ECF No. 38 (Motion to Dismiss FAC), at 8:26. Defendant X Holdings Corp is X Corp's parent company. *Id.* Defendant Elon Musk, who owns X Holdings Corp, is alleged to be the sole owner and CEO of Twitter during the events of this case; he became the owner of Twitter on October 27, 2022. *Id.* ¶¶ 3, 9.

From August 2020 through January 4, 2023, Plaintiff Courtney McMillian was an employee at Twitter as the Head of People Experience leading Compensation, Benefits, and other global functions. *Id.* ¶ 5. She was notified of her termination in October 2022. *Id.* From June 2021 through April 28, 2023, Plaintiff Ronald Cooper was a Workplace Operations, Facilities, and People Manager. *Id.* ¶ 6. He was notified on February 24, 2023 of his termination after he was locked out of Twitter's systems. *Id.*

In their operative complaint, which amended the initial complaint filed on July 12, 2023, Plaintiffs allege that Twitter maintained a policy and practice of paying regular severance benefits for many years. ECF No. 13 (FAC) ¶ 2. Since at least 2019, Plaintiffs claim that Twitter formalized this policy in several documents that provide a uniform and detailed policy framework for the numerous post-termination benefits Twitter provided to employees. ECF No. 75 (Plaintiffs' Answers to the Court's Notice of Questions). Plaintiffs further allege that "[s]tarting on October 27, 2022, Defendants failed to provide Plan participants with the promised benefits they were entitled to under the Plan." *Id.* ¶ 92. As a result of that failure, Plaintiffs bring this action on behalf of themselves and on behalf of a putative class composed of "[a]ll participants and beneficiaries of the Plan who were terminated from Twitter since the date of Defendant Musk's takeover, October 27, 2022, through the date of judgment." *Id.* ¶ 82.

Defendants claim that Twitter did not maintain a severance plan governed by ERISA and therefore the Court lacks jurisdiction under ERISA. ECF No. 38 (Motion to Dismiss); ECF No. 73 (Defendants' Responses to Notice of Questions), at 2. Defendants contend Plaintiffs have identified no governing plan documents or "formalized polic[ies]" that provide an ongoing administrative scheme for Twitter severance payments, let alone "effective dates" for such

documents.  *Id.*

Plaintiffs, by contrast, claim there is a "formalized policy [memorialized] in the several documents that provide a uniform and detailed policy framework for the numerous post-termination benefits Twitter provided to employees." *Id.* ¶¶ 27, 28, 38, 39, 41 42, 43, 44, 46, 50. This policy is the severance plan alleged to be governed by ERISA and is supposed to apply to *all employees* who depart Twitter.  *Id.* ¶ 38 ("…Twitter assured employees…"); ¶ 39 ("Twitter executives made similar promises in *company-wide, all hands* meetings…") (emphasis added); ¶ 42 ("The same day the Merger Agreement was announced, [Twitter] met with *all Twitter employees* and informed them that the Merger Agreement required Twitter to continue to provide the Severance Plan benefits for at least one year following the change in company ownership."); ¶ 43 ("…provide severance payments and benefits to *each continuing employee*…") (emphasis added); ¶ 48 ("…Provide continuing *Tweeps whose employment [is] terminated*…") (emphasis added).

Plaintiffs state that there was a Matrix used by Twitter "to determine an employee's eligibility for severance, and the amount and type of severance an eligible employee would receive." ECF No. 13 (FAC) ¶ 28.  Plaintiffs further allege that the policy that had been in effect for years up until Twitter's takeover provided that "[w]hether an employee was eligible for severance and the amount and type of severance an eligible employee would receive was dependent on several factors, including the reason for the departure, an employee's tenure at the company, job level, department, restricted stock unit (RSU) issuance and price of RSUs at the time of departure, whether the employee's departure entailed any legal risk for the company, and other factors." *Id.* ¶ 29.

Plaintiffs' allegations also include an explanation of the types of benefits that Plaintiffs claim were included in the plan that had been applied before the takeover.  Those were "payments based on employee salary, tenure, job level, department, and reason for departure; a payment for health insurance continuation; pro-rated bonuses for certain types of employees; payments for RSUs; and outplacement services." *Id.* ¶ 30.

Plaintiffs further detail the components of the post-termination severance benefits that had

United States District Court
Northern District of California

been offered by the severance plan prior to Twitter's takeover, along with the benefits that were promised to all employees after Twitter's takeover. The components are: (1) "Outplacement services to departing employees were provided through a third-party service provider. The duration of this service depended on an employee's level at the time of separation, as did Twitter's contribution for continued health coverage," although the outplacement services could last three to six months, and a cash contribution for health insurance was later promised after the takeover. ECF No. 13 (FAC) ¶¶ 31, 75; (2) "A payout for Restricted Stock Units (RSUs) [were] issued to employees as part of their compensation. Terminated employees were entitled to the value of any RSUs that vested according to their regular schedule for a period of three to six months following termination, depending on employee level. The value of each RSU was set according to an average price at the time of separation." *Id.* ¶¶ 32, 75, 103; ECF No. 1-1, at 34-35 (Merger Agreement also showing formula applied to calculate any amounts paid in cash); (3) Continued health coverage benefits as stated above, were also provided prior to the takeover. *Id.* ¶¶ 30, 75; and (4) Bonuses that were pro-rated were also paid and offered. *Id.* For calculating the RSU that would be provided to laid off employees because of the takeover, Plaintiffs allege that "any vested RSUs would immediately convert into payments of $54.20—Defendant Musk's offer price— while any unvested RSUs would convert 'into the right to receive an amount in cash' equal to Defendant Musk's offer price, which would 'vest and be payable' according to the same schedule as applied immediately prior to the merger." *Id.* ¶¶ 43, 75, 76.

Plaintiffs also allege that there were communications with promises to employees showing, upon layoffs due to the takeover, the amount of the severance benefits offered to terminated employees would include: "at least…two months base salary or On Target Earnings for employees on the Sales Incentive Plan; Pro-Rated Performance Bonus Plan compensation at target; Cash value of equity that would have vested within three months from the separation date; [and a] cash contribution for health care continuation." *Id.* ¶ 49; ECF No. 75-1 (Declaration of Courtney McMillian ("McMillian Decl.")), at 4-5.

Plaintiffs allege that the severance plan was administered in San Francisco, California during both periods, that is before and after the takeover. ECF No. 75 (Plaintiffs' Answers to the

United States District Court
Northern District of California

Court's Notice of Questions), at 6:12-18.  Plaintiffs also allege that the underlying events that are the basis for the alleged ERISA violations occurred in San Francisco, California.  *Id.* Accordingly, Plaintiffs state the Northern District is the proper venue for this action under 29 U.S.C. §§ 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject Plan is administered and where at least one of the alleged breaches took place.  Plaintiffs further state it is also the district in which Defendants Twitter / X Corp and X Holdings reside.  ECF No. 13 (FAC) ¶ 13.

Plaintiffs claim that the administration of a severance plan was ongoing for many years and effectuated by teams of employees from several departments within Twitter, as well as by contracts with third parties.  For instance, Plaintiffs allege that "Twitter tasked several Human Resources employees with applying the Matrix to departing employees.  These employees created and used templates and spreadsheets to process claims for benefits under the Plan." *Id.* ¶ 33. Plaintiffs claim that "employees from other departments in Twitter were involved in applying the Matrix to departing employees, assessing their eligibility, applying the factors contained in the Matrix, and ensuring that the payments and services set forth in the Matrix were provided to departing employees." *Id.* ¶ 34.

Plaintiffs allege that each of the Defendants, including Musk "were fiduciaries with respect to the Plan and its participants because they exercised discretionary authority or control over the management of the Plan and/or were involved in its administration," *id.* ¶¶ 2,19, "made decisions about the size and availability of Plan disbursements, and which and how many employees would be eligible for them," *id.* ¶ 20, "communicated with employees about the availability of severance," *id.* ¶ 21, and as such, "communicated with employees about the availability of severance." *Id.* ¶ 22.  Prior to October 27, 2022, four individuals were responsible for exercising discretionary responsibility over administration and management of the Plan.  ECF No. 75 (Plaintiffs' Answer to the Court's Notice of Questions), at 5.  Plaintiffs contend these employees were all fiduciaries.  *Id.*  Plaintiffs further state that besides Musk, only one remained with Twitter after October 27, 2022.  *Id.*

Plaintiffs additionally allege that the "administration of the Plan required regular, ongoing

United States District Court
Northern District of California

1    expenses of company funds." *Id.* ¶ 36.

2          Plaintiffs claim that the severance plan they seek to enforce through this action was

3    composed of other documents and communications, besides the Merger Agreement that is

4    attached to Form 8-K.  Those documents and communications are alleged to be: (1) a company-

5    wide email circulated by Twitter entitled "Acquisition FAQs" about the plan in April, June, and

6    October 2022, along with regular updates to those FAQs, which repeated information in Section

7    6.9 of the Merger Agreement; (2) another company wide email in May 2022 informing employees

8    of the plan and its contents; (3) communications in company-wide all-hands meetings, *id.* ¶¶ 38,

9    39, 46, 47, 48; (4) communications made by Twitter's then-CEO Parag Agrawal and its then-

10   Chairman Bret Taylor to all Twitter employees during a meeting that Twitter would "continue to

11   provide the Severance Plan benefits for at least one year following the change in ownership," *id.* ¶

12   42; and (5) a public letter, restating the communications made by the then-CEO and then-

13   Chairman, also filed with the United States Securities Exchange Commission ("SEC"), to Twitter

14   stockholders encouraging them to approve the Merger Agreement.  That letter stated that "[d]uring

15   the one-year period following the effective time of the merger, Parent [X Holdings] will, or will

16   cause the surviving corporation [X Corp.] or any of their affiliates to, provide severance payments

17   and benefits to each continuing employee immediately prior to the effective time of the merger

18   under the existing arrangements providing compensation or employee benefits." *Id.* ¶ 43.

19          Another action, *Cornet v. Twitter, Inc.* No. 22-cv-06857-JD, 2022 WL 18396334, at *1

20   (N.D. Cal. Nov. 3, 2022), also seeks relief on behalf of a class for the failure to pay severance

21   benefits.  *Cornet* was transferred to the District of Delaware and assigned Case No. 23-cv-00441-

22   JLH.  The *Cornet* plaintiffs assert contract-based claims for severance benefits on behalf of a

23   nationwide putative class of X Corp employees and former employees that had been promised that

24   "if there were layoffs, employees would receive benefits and severance at least as favorable as the

25   benefits and severance that Twitter previously provided to employees." *See id.*, ECF No. 40

26   (SAC) ¶ 27.  The *Cornet* plaintiffs allege that "promises [were] communicated to employees orally

27   in 'all-hands' meeting and in writing by HR, management, including former CEO and others."

28   *Id.* ¶ 28.  The *Cornet* plaintiffs also state in their SAC that promises were also made in writing,

including in the Merger Agreement and through distribution of a FAQ. *Id.* ¶¶ 28, 29, 30.

In this action brought by Plaintiffs McMillian and Cooper, Defendants filed a Motion to Dismiss primarily disagreeing that the severance plan Plaintiffs seek to enforce is governed by ERISA. Defendants argue that Plaintiffs failed to plead sufficient allegations to bring any claims under ERISA governance. ECF No. 38. Also before the Court is Plaintiffs' Request for Judicial Notice, ECF No. 47, and Plaintiffs' Motion for Notice of Suit. ECF No. 24.

Having carefully considered the parties' briefs, arguments, relevant legal authority and for the reasons stated below the Court GRANTS Plaintiffs' request for judicial notice.

The Defendants' Motion to Dismiss is GRANTED and the Court finds the Motion for Notice of Suit moot.

The Court GRANTS Plaintiffs' leave to amend the complaint, but only as to claims that are not governed by ERISA, since amendment of the complaint as to any ERISA would be futile.

### III.    JUDICIAL NOTICE

Under the Federal Rules of Evidence, Rule 201(b)(2), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it…can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Under Rule 201(c)(1) and (d), "the court may take judicial notice on its own" and may do so "at any stage of the proceeding." The Court "need not accept as true allegations contradicted by judicially noticeable facts, *see Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it 'may look beyond the plaintiff's complaint to matters of public record' without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995)." *Sciacca v. Apple, Inc.*, 362 F.Supp.3d 787, 794 (N.D. Cal. 2019).

Plaintiffs request the Court take judicial notice of documents filed with the SEC: a Form 8-K and S-1. ECF No. 47 (Plaintiffs' Request for Judicial Notice); ECF No. 47-1 (Exhibit A to Request for Judicial Notice ("Form 8-K" and "Merger Agreement")); ECF No. 47-2 (Exhibit B to Request for Judicial Notice ("Form S-1 Twitter, Inc. Change of Control Severance Policy")). The SEC filings are publicly available documents filed with the SEC and "not subject to reasonable

dispute because [they]…can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Court was "supplied with the necessary information," and therefore the court "must take judicial notice if a party requests it." Fed. R. Evid. 201(c)(2). Judicial notice of publicly available financial documents, including SEC filings, is proper at the motion to dismiss stage. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064, n.7 (9th Cir. 2008) (citing *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946, n.2 (9th Cir. 2006)). Given the above, the Court grants Plaintiffs' Request for Judicial Notice.

In addition, Plaintiffs appear to be requesting that the Court incorporate by reference the portion of the documents judicially noticed, such as the Merger Agreement attached to Form 8-K, because the allegations in the operative complaint at Paragraphs 8, and 40-48 refer to that Agreement. ECF No. 47, at 3:11-16. Under *Townsend v. Columbia Operations*, 667 F.2d 844, 849 (9th Cir. 1982), this request is appropriate, and the Court is permitted to consider the documents "outside the pleading" when proper.

Plaintiffs cite to Section 6.9 of the Merger Agreement to support their allegations that Twitter and Defendant Musk informed the plan participants and beneficiaries that the severance plan would remain in effect post-merger. ECF No. 13 (FAC) ¶ 40. Plaintiffs state: "Section 6.9 of the Merger Agreement provided for one year following the closing of the merger, Twitter would continue to provide Plan participants with "[s]everance payments and benefits…no less favorable than" those provided under Twitter's policies immediately prior to the merger." *Id.* ¶ 41.

Plaintiffs continue to outline the terms of the agreement to provide certain employees severance payments and benefits. *Id.* ¶¶ 42-48. In the Merger Agreement, "company benefit plan" is defined as "(i) employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA), and (ii) each other employment agreement, bonus, stock option, stock purchase, or other equity-based, benefit, incentive compensation, profit sharing, savings, retirement (including early retirement and supplemental retirement), disability, insurance, vacation, incentive, deferred compensation, supplemental retirement (including termination indemnities and seniority payments), severance termination, retention, change of control and other similar fringe, welfare or other employee benefit plans, benefit programs, benefit agreements,

1   benefit contracts, benefit policies or benefit arrangements (whether or not in writing), in each case,

2   (x) which is sponsored, maintained or contributed to for the benefit of or relating to any current or

3   former director, officer or employee of the Company or its Subsidiaries and (y) with respect to

4   which the Company or any of its Subsidiaries has or may have any liability." ECF No. 47-1

5   (Form 8-K; Merger Agreement), at 18.

6          When a court deems a document incorporated by reference into a complaint, it may assume

7   its contents are true for the purposes of a motion to dismiss under Rule 12(b)(6). *Khoja v.*

8   *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002-03 (9th Cir. 2018). Plaintiffs allege that the

9   putative ERISA plan fiduciaries include Twitter and its successor company X Corp and Elon

10  Musk. ECF No. 13 (FAC) ¶ 4. Form 8-K states: "On April 25, 2022, Twitter, Inc. ('Twitter')

11  entered into an Agreement and Plan of Merger ('Merger Agreement') with X Holdings I, Inc.

12  ('Parent'), X Holdings II, Inc., a wholly owned subsidiary of Parent ('Acquisition Sub'), and

13  solely for the purpose of certain provisions of the Merger Agreement, Elon R. Musk." ECF No.

14  47-1 (Exhibit A to Request for Judicial Notice), at 3. As such, that portion of the Merger

15  Agreement, regarding the company's succession, is incorporated by reference, along with Section

16  6.9 and the definitions.

17      **IV.    STANDARD**

18          **A.  Motion to Dismiss**

19          A complaint may be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it fails to

20  include "a short and plain statement of the claim showing that the pleader is entitled to relief."

21  *Sciacca*, 362 F.Supp.3d at 793 (quoting Rule 8(a)(2)). To survive a motion to dismiss under

22  12(b)(6) a complaint must contain "enough facts to state a claim to relief that is plausible on its

23  face." *Id.* at 793-94 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has

24  facial plausibility when the plaintiff pleads factual content that allows the court to draw the

25  reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 794 (quoting

26  *Ashcroft v. Iqbal*, 556 U.S. 622, 678 (2009)). "Labels and conclusions" or "formulaic recitation of

27  the elements of a cause of action" do not suffice. *Twombly*, 550 U.S. at 555. "'[C]onclusory

28  allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss.'

1    *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004)." *Sciacca*, 362 F.Supp.3d at 794.

2         On a motion to dismiss, "the Court accepts the material facts alleged in the complaint,

3    together with all reasonable inferences to be drawn from those facts, as true." *Opperman v. Path,*

4    *Inc.*, 87 F. Supp. 3d 1018, 1034-35 (N.D. Cal. 2014).  All reasonable inferences are drawn in favor

5    of the non-moving party.  *Retail Prop. Trust v. United Bd. of Carpenters & Joiners of Am.*, 768

6    F.3d 938, 945 (9th Cir. 2014); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031

7    (9th Cir. 2008).  "The Court, however, need not accept as true allegations contradicted by

8    judicially noticeable facts, *see Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), 234

9    F.3d at 435, and it 'may look beyond the plaintiff's complaint to matters of public record' without

10   converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d

11   1128, 1129 n.1 (9th Cir. 1995)." *Sciacca*, 362 F.Supp.3d at 794; *Fayer*, 649 F.3d at 1064 (per

12   curiam) (The Court does not have to "assume the truth of legal conclusions merely because they

13   are cast in the form of factual allegations") (internal quotation marks omitted).

14        "[C]ourts must consider the complaint in its entirety, as well as other sources courts

15   ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents

16   incorporated into the complaint by reference, and matters of which a court may take judicial

17   notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The Court may

18   consider declarations as well, since "the district court is not restricted to the face of the pleadings,

19   but may review evidence, such as affidavits and testimony, to resolve factual disputes concerning

20   the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

21        **B.  ERISA Governed Plans**

22        Under 29 U.S.C. § 1132(a)(1)(B), "[a] civil action may be brought (1) by a participant or

23   beneficiary…(B) to recover benefits due to him under the terms of his plan, to enforce his rights

24   under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan…"

25   29 U.S.C. § 1132(a)(3) further provides that a civil action to recover benefits allegedly owed under

26   an ERISA Plan can be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or

27   practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain

28   other appropriate relief (i) to redress such violations or (ii) to enforce any provisions of this

United States District Court
Northern District of California

12

1  subchapter or the terms of the plan."

2      ERISA applies to "*plans*, rather than simply to *benefits*.'" *Fort Halifax Packing Co. v.*

3  *Coyne*, 482 U.S. 1, 11 (1987) (emphasis in original); *Patelco Credit Union v. Sahni*, 262 F.3d 897,

4  907 (9th Cir. 2001); *Howard Jarvis Taxpayers Ass'n v. Cal. Secure Choice Ret. Sav. Program*,

5  997 F.3d 848, 858 (9th Cir. 2021).  This is because "[o]nly 'plans' involve administrative activity

6  potentially subject to employer abuse." *Fort Halifax*, 482 U.S. at 16.  "This focus on 'benefit

7  plans' is consistent with the first underlying purpose of ERISA-protecting employees against the

8  abuse and mismanagement of funds." *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,

9  546 F.3d 639, 648-49 (9th Cir. 2008).  "ERISA seeks to make the benefits promised by an

10  employer more secure by mandating certain oversight systems and other standard procedures."

11  *Howard Jarvis*, 997 F.3d at 861 (internal quotation marks omitted).  "When employers merely

12  perform mandatory administrative functions in a government benefits scheme that do not require

13  the employer to exercise 'more than a modicum of discretion,' *Golden Gate*, 546 F.3d at 650, the

14  employer does not 'establish or maintain' an ERISA 'plan' because the employer is not engaging

15  in the type of conduct that ERISA seeks to regulate." *Id.*  Accordingly, whether there is an ERISA

16  plan depends on whether there is an "ongoing administrative scheme." *Fort Halifax*, 482 U.S. at

17  18; *Delaye v. Agripac, Inc.*, 39 F.3d 235, 237-38 (9th Cir. 1994).  "[T]he existence of an ERISA

18  plan is a question of fact, to be answered in light of all the surrounding circumstances from the

19  point of view of a reasonable person." *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1120

20  (9th Cir. 1998).

21  **V.**    **DISCUSSION**

22      For Plaintiffs' operative complaint to survive the Motion to Dismiss, Plaintiffs must plead

23  sufficient facts "that allow[] the court to draw the reasonable inference" that the severance plan is

24  governed by ERISA.  *See Sciacca*, 362 F.Supp.3d at 794.  Severance benefit plans are permitted

25  under ERISA and are common.  *See e.g., Massachusetts v. Morash*, 490 U.S. 107, 116 (1989)

26  ("[P]lans to pay employees severance benefits…are employee benefit plans within the meaning of

27  the Act."); *see also* 29 U.S.C. § 1002 (3).  For a severance benefit plan to be governed by ERISA

28  however, it must be an "ongoing administrative program for processing claims and paying

United States District Court
Northern District of California

benefits." *Fort Halifax*, 482 U.S. at 12.

Plaintiffs cite *Bogue v. AmEx Corp.*, 976 F.2d 1319 (9th Cir. 1992) to argue that the employer's thoughts regarding whether it would need to administer an ERISA plan are irrelevant because there is no way to administer the program without an administrative scheme. ECF No. 45 (Opposition), at 11. It is true that the employer's belief that a plan is or is not governed by ERISA is not the test for whether a plan is governed by ERISA. Similarly, former employees' unilateral understanding of what severance benefits may have been available to them, or the distribution of severance benefits to previous employees, does not establish an ERISA Plan. This is because an employer can have a severance agreement that provides former employees severance payments based on set calculations without converting that agreement into an ERISA governed plan that would require the employer to pay future terminated employees those same benefits. *See Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997) (holding an employer's mathematical calculations of severance benefits, like the alleged calculations here, required little "ongoing particularized discretion" and were not "sufficient to turn a severance agreement into an ERISA plan.") If a plan meets the criteria for an "employee welfare benefit plan" then it is governed by ERISA. *See* 29 U.S.C. § 1001 *et seq.* An administrative scheme is therefore not required for an employer to provide severance payments or benefits even though an administrative scheme is required for a plan to be governed by ERISA.

The operative complaint lists the severance benefits components and the payments Plaintiffs expected for each of those components after Twitter's takeover. The allegations state the formulas provided for the human resources staff to calculate amounts (or the cash equivalent) of benefits that would be paid to the terminated employees in one lump sum and provided at one point in time. Because there are set formulas, or mathematical calculations of severance benefits, to be paid at one point in time without any "ongoing particularized discretion", these allegations do not show that Plaintiffs adequately pled an ongoing administrative scheme under *Velarde*.

Plaintiffs rely on *Bogue* to argue that even if the plan required only a lump sum payment, it would still comprise an "ongoing administrative scheme" because the analysis and payments "occur more than once, at a different time for each employee." ECF No. 45 (Opposition), at 13.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In *Bogue*, the employer defendant was acquired by another company and established a severance

2    program to provide benefits to executive employees who were not offered "substantially

3    equivalent" positions by the buyer.  976 F.2d at 1321.  The court found "the program's

4    administrator [] remained obligated to decide whether a complaining employee's job was

5    'substantially equivalent' to his pre-acquisition job," which required a case-by-case, discretionary

6    application of the program's terms.  *Id.* at 1323.

7          ERISA can govern a severance plan that provides a one lump sum payment, as *Bogue*

8    illustrates.  *See id.* at 1323.  However, *Bogue* can be distinguished from the facts here.  In *Bogue*, a

9    discretionary analysis had to be performed on a case-by-case basis to determine whether a former

10   position was "substantially similar" to a new position.  *See id.* at 1321.  Here, by contrast, Twitter

11   paid and offered to pay severance payments based on basic employment criteria that involved

12   mathematical calculations, which does not involve a "case-by-case" analysis or "discretionary

13   application" of the Twitter severance benefits' terms.  Twitter's payments were "fixed, due at

14   known times, and [did] not depend on contingencies outside the employee's control."  *Golden*

15   *Gate*, 546 F.3d at 650-51.  Here, as discussed above, the calculation of the amount and type of

16   severance an employee "would receive was dependent on several factors, including the reason for

17   the departure, an employee's tenure at the company, job level, department, restricted stock unit

18   (RSU) issuance and price of RSUs at the time of departure..."  ECF No. 13 (FAC) ¶ 29.

19         Relatedly, the operative complaint's facts do not show that there was any discretion

20   required in determining which employees were eligible because all employees qualified for the

21   severance plan upon termination due to the acquisition and subsequent merger.  The operative

22   complaint also does not allege sufficient facts so that the Court can reasonably infer that there was

23   discretion in terms of how much a terminated employee would receive for a bonus because there

24   was a formula for calculating severance payments that staff could apply before issuing payment.

25   On balance, the Court finds Plaintiffs' operative complaint fails to state sufficient facts to show

26   that discretion needs to be exercised in applying the terms of the Twitter severance plan to

27   calculate severance benefits for the employees laid off due to Twitter's takeover.

28         The Court's order regarding Twitter's Motion to Dismiss in *Schobinger v. Twitter*, No. 23-

15

United States District Court
Northern District of California

1    cv-03007-VC (June 20, 2023) does not conflict with this finding.  That Order illustrates that the

2    calculation of the bonus component of the severance plan promised to employees one year

3    following the change in ownership or merger was based on a formula and did not involve

4    "ongoing particularized discretion".

5          In *Schobinger*, the Plaintiff brought an action on his own behalf and on behalf of a putative

6    class of former and current Twitter employees who were employed by the Company as of January

7    1, 2023, and who have not been paid their annual bonus for 2022.  ECF No. 1 (Complaint) ¶ 1

8    filed in *Schobinger*, No. 23-cv-03007-VC.  The *Schobinger* complaint alleges breach of contract

9    and promissory estoppel on behalf of a putative class who were promised performance bonuses if

10   they chose to stay with Twitter.  But, they were not paid their annual bonus for 2022 even though

11   they chose to stay with Twitter.[3]

12         The *Schobinger* complaint states that "Twitter has an employee cash performance bonus

13   plan ('PBP' or 'Bonus Plain') that is paid out annually.  Each year, the company has an overall

14   target for the bonus plan, and employees each have a calculated amount of bonus (which is based

15   on a percentage of their base salary) they will receive if the company pays bonus out at the target

16   amount." *Id.* ¶ 2 (cited in *Schobinger*, No. 23-cv-03007-VC, ECF No. 37, at 2).  "Traditionally,

17   individuals covered by the bonus plan who are employed by the company at the time bonuses are

18   paid out (typically in March) receive their annual bonus for the prior year." *Id.*  The complaint

19   further states: "In the months leading up to Elon Musk's acquisition of Twitter in October 2022,

20   the company's executives, including former Chief Financial Officer, Ned Segal, repeatedly

21   promised Plaintiff and the company's other employees that 2022 bonuses would be paid out at

22   fifty percent (50%) of target.  This promise was repeatedly following Musk's acquisition.  Plaintiff

23   and other Twitter employees relied upon the promise that they would receive their 2022 bonus

24   when choosing to remain employed by Twitter following Musk's acquisition of the company

25

26   ---
     [3]      The Motion for Class Certification is due by July 23, 2023, with responses due by August
27   20, 2024, replies due by September 6, 2024.  *Schobinger v. Twitter*, No. 23-cv-03007-VC, ECF
     No. 60 (Order by Vince Chhabria granting [58] Stipulation to Modify Briefing Schedule for
28   Plaintiff's Motion for Class Certification).  The hearing on the motion is set for September 19,
     2024. *Id.*

and/or deciding to forgo other employment opportunities." *Id.* ¶ 3 (cited in *Schobinger*, No. 23-cv-03007-VC, ECF No. 37, at 2). In its order denying Defendant's Motion to Dismiss the Breach of Contract Claim, the *Schobinger* Court states "Schobinger is not suing to enforce Twitter's discretionary bonus plan. He is suing to enforce Twitter's alleged subsequent oral promise that employees would in fact receive a percentage of the annual bonus contemplated by the plan if they stayed with the company." *Schobinger v. Twitter Inc. et al*, Case No. 23-cv-03007-VC (N.D. Cal. Dec. 22, 2023).

Similarly, in this case, Plaintiffs are suing to recover severance benefits that include a bonus component promised because of the change in ownership, or in other words, because of the mass layoffs. *See* ECF No. 13 (FAC) ¶ 49 ("The Acquisition FAQ update from October 24, 2022, states: Generally speaking, in the event of a position elimination our current severance package includes…Pro-Rated Performance Bonus Plan compensation at target") (internal quotation marks omitted); ¶ 51 ("the severance components included…prorated performance bonuses"); ¶ 75 ("all employees are entitled to…bonuses"); ¶ 76 ("As a Level-8 employee with two years tenure at Twitter, Plaintiff McMillian was entitled to…any bonuses, prorated to the time of termination"). From the facts alleged in the operative complaint, the Court can reasonably infer that the bonus component of the severance plan did not require eligibility determinations, was based on a mathematical calculation, and applied to all employees if the company choose to provide bonuses.

Plaintiffs also cite *Karkowski v. Goodrich Corp.*, 448 F.3d 843, 849 (6th Cir. 2006), and *Champagne v. Revco*, 997 F.Supp. 220, 225 (D.R.I. 1998) to argue that the plan is one of ongoing administration because it offered outplacement services along with the lump-sum payments. ECF No. 45 (Opposition), at 12-13. If the severance plan that applied after Twitter's takeover did provide outplacement services, the complaint does not state sufficient facts to show that an ongoing administrative scheme is required for such services. First, the complaint states that "[o]utplacement services to departing employees were provided through a third-party service provider," and that "[t]he duration of this service depended on an employee's level at the time of separation, as did Twitter's contribution for continued healthcare coverage." ECF No. 13 (FAC) ¶ 31. It is therefore reasonable to infer that, based on the allegations in the complaint, once the

United States District Court
Northern District of California

outplacement services are granted to a terminated employee, such as before the buyout in October 2022, Twitter would have no further obligations or responsibilities regarding the terminated employees' involvement with those services. Once the employee qualifies for outplacement services, it is the employee (not the employer) who is the party responsible for communicating with the third-party providing outplacement services for the three to six months that those services are provided. Thus, that component would require little "ongoing particularized discretion" by the employer.

The above is all assuming a cash equivalent is not provided in lieu of the outplacement services. It is reasonable to infer from the operative complaint's allegations that if any benefits were received for outplacement services after October 2022 it was probably a cash equivalent of those outplacement services; and, the employer providing a cash equivalent would not require an "ongoing administrative scheme" because it would be a one-time distribution that required no particularized discretionary analysis. *See Delaye*, 39 F.3d at 238. Because of the class definition and the focus on the promises made, a reasonable inference is that either (1) no outplacement services were provided as a part of the severance plan for after the October 2022 takeover, or (2) a cash equivalent was provided instead of the services. *See* ECF No. 13 (FAC) ¶ 49; ECF No. 75-1 (McMillian Decl.), at 4-5. Plaintiffs go on to explain that their facts mirror the facts in *Edwards v. Lockheed Martin Corp.*, 954 F.Supp.2d 1141, 1151 (E.D. Wash. 2013), *aff'd* 617 F.App'x 648 (9th Cir. 2015) ("Given the massive scope of the Plan—approximately 2,263 employees were eligible to participate—it would have been exceedingly difficult for Defendant to have administered the program *without* an administrative scheme in place.") (cleaned up; emphasis in original). Both here and in *Edwards*, there is a high number of employees that appear to be eligible to participate in the severance plan. *See* ECF No. 13 (FAC) ¶ 70 (1,300 employees remaining out of 7,500 employees after layoffs).[4] In this case, however, the severance plan does not resemble an "ongoing administrative program" within the meaning of *Fort Halifax* or an

---

[4] The number of employees eligible to participate in the severance plan would not be equivalent to the number of employees that could be putative class members in this action given the number of employees participating in other lawsuits arising from the failure to pay severance or wages, or both.

"ongoing particularized, administrative, discretionary analysis" within the meaning of *Delaye*.

In *Edwards*, there were ample discretionary decisions made regarding (1) eligibility; (2) disqualification; (3) adjustments in awards; (4) interpretation of the plan's terms; and (5) sufficient claims procedures. *Id.* at 649-50 (citing *Bogue*, 976 F.2d 1319). Additionally, in *Edwards*, the plan was held to "require[] additional work for plan administrators if former employees who gain a separation benefit under the [plan] return to [employer] within a year…" *Id.* Here, on the other hand, the operative complaint does not state sufficient facts to show there was any discretion exercised in eligibility for the severance plan after Twitter's takeover, since it is reasonable to infer from the employer's communications stated in the operative complaint that all terminated employees were eligible regardless of the reason for termination. There are also insufficient facts stated to show there was any discretion exercised in disqualification of employees participating in the severance plan since the operative complaint appears to show that a one-time payment would be made for all components thereupon requiring little need for ongoing oversight or continuing qualification analyses. This is especially because all employees were eligible if they were terminated, and if eligible they would receive severance payments.

The allegations in the amended complaint show there were set amounts for those payments, and therefore no discretionary analysis was required for adjustments of the payments. Relatedly, the allegations do not state facts from which it would be reasonable to infer that there was an interpretation of plan terms, or particularized or discretionary analysis needed, since the formulas for calculating severance payments were already set. The court can draw the reasonable inference that the spreadsheets used by Human Resources included those formulas and there was no "additional work" for the employer after payments were made. Given the above, the allegations in the first amended complaint are insufficient to show *Edwards* applies.

Twitter made communications to employees who were terminated after Musk's takeover in October 2022 regarding the components of the severance plan that would apply to all employees laid off due to the takeover. Those communications did not include statements regarding litigation risk or other factors beyond salary or OTE, bonuses, cash equivalent for continuing healthcare, and RSUs. Because of the promises to the laid off employees, it is not reasonable for the Court to

United States District Court
Northern District of California

19

infer that the litigation risk component and "other factors" were part of the severance plan after Twitter's takeover.  Since the litigation risk and "other factors" are not part of the severance plan that applies after Twitter's takeover, the Court does not need to address whether litigation risk and other factors involved "ongoing particularized discretion" so that the allegations are "sufficient to turn a severance agreement into an ERISA plan."

Plaintiffs further allege that four individuals were responsible for exercising discretionary authority or discretionary responsibility over administration and management of the Plan prior to October 27, 2022.  ECF No. 75, at 5.  Plaintiffs contend these employees were all fiduciaries, along with Defendant Musk.  *Id.*  Plaintiffs state that besides Musk, only one remained with Twitter after October 27, 2022.  Although, Plaintiffs state they are unaware of which individual exercised discretionary authority or responsibility over the administration and management of the Plan.  Together Plaintiffs argue this shows that the employer was making the decisions regarding which employees would receive severance pay.

In support, Plaintiffs cite *Bogue* and contrast *Delaye* and *Velarde* to support their argument that a discretionary analysis is required for the payments and benefits to be provided to the former employees.  Yet the operative complaint's allegations do not show that who would receive severance benefits was particularized or required some discretion.  First, all employees appeared to be eligible for the plan.  Second, there were formulas used for calculating the severance benefits for various categories of employees, depending on defined characteristics such as role and tenure.  Together, this shows the complaint lacks sufficient allegations to show a discretionary analysis was required for the payments and benefits to be provided to former employees.

Plaintiffs allege that both Plaintiff McMillian and Plaintiff Cooper were offered a certain amount of severance payments, but they were not offered the amount that they thought they were entitled to receive under the plan.  The amount they were offered appears to be a one lump sum amount based on a set calculation.  This shows that it was possible to provide payments to terminated employees in an unthinking, non-particularized, non-discretionary manner, since the payments were based on set formulas relating to a variety of predetermined factors.  The amount paid was an amount over and above ordinary wages; but, that does not mean it was an amount paid

1    under an ERISA governed plan.  "[A]n employer's obligation to make monetary payments based

2    on the amount of time worked by an employee, over and above ordinary wages, does not

3    necessarily create an ERISA plan.  This is so even if the payments are made by the employer

4    directly to the employees who are the beneficiaries of the putative 'plan'."  *Golden Gate*, 546 F.3d

5    at 649.  This is especially the case when employers "make the payments 'on a regular basis from

6    [their] general assets'" since "[i]f employers made the payments directly to the employees, there

7    would be little to differentiate those payments from wages paid to employees." *Id.* at 650.

8         Finally, the operative complaint does not state facts showing that there is a risk of

9    mismanagement of the funds or other abuse for the reasons stated above.

10        For the period before October 27, 2022, the operative complaint's allegations show there is

11   little to no room for mismanagement of funds or other abuses given the formulas used for

12   calculating severance payments, and the facts do not show there was any particularized or

13   discretionary and thinking analysis to determine the amount of benefits that would be issued to

14   departing employees.  For the period after October 27, 2022, there is even less of a chance that

15   there could be a mismanagement of funds or other abuse.  For instance, the operative complaint

16   states facts that show to provide the severance payments, Human Resources staff applies a simple,

17   mechanical, one-time calculation (presumably in the spreadsheets with formulas already set up).

18   The payments can be paid out in lump sum using spreadsheets to calculate the amounts.

19   Therefore, it is reasonable to infer there is no need for ongoing payments, claims processing, or

20   other monthly or periodic revisiting of a particular employee's (or individual employee's)

21   payments or benefits processing that could create a fertile ground for abuse or mismanagement.

22        Even though the severance plan should have been in effect for at least a year after the

23   takeover or merger, that does not necessarily mean that each putative ERISA plan participant

24   needs to have severance payments or benefits administered monthly during that year.  The

25   operative complaint states facts showing that the terminated employees would receive a one-time

26   payment based on a calculation of set formulas.  In any event, under *Delaye*, if the terminated

27   employees were to receive monthly payments for a year, that does not show there is an ongoing

28   administrative scheme.  *See Delaye*, 39 F.3d at 237 ("[s]ending Delaye, a single employee, a check

United States District Court
Northern District of California

21

United States District Court
Northern District of California

every month plus continuing to pay his insurance premiums for the time specified in the employment contract does not rise to the level of an ongoing administrative scheme.")

In closing, there are insufficient facts alleged in the operative complaint that the putative ERISA plan is an "ongoing administrative scheme" so that it would be ERISA governed.  For this reason, Plaintiffs have not pled sufficient facts that "allow[] the court to draw the reasonable inference" that the putative post-termination benefit plan (or severance benefit plan) is governed by ERISA.  *See Sciacca*, 362 F.Supp.3d at 794 (quoting *Ashcroft*, 556 U.S. at 678).

All of Plaintiffs' claims in their operative complaint require the plan to be governed by ERISA.  As such, the complaint fails to state sufficient facts to survive a Motion to Dismiss as to all those claims since there is not a sufficient showing of an ERISA governed plan as to any of the components that were part of the severance plan promised to employees in the event of layoffs after Twitter's takeover in October 2022.  As a result, the Court lacks jurisdiction.  However, Plaintiffs are not without recourse.  Indeed, there are other cases brought against Twitter for the failure to pay wages or provide employee severance benefits during the same or overlapping period that Plaintiffs allege Defendants denied them and the putative class sufficient severance benefits under the severance plan at issue here.

## VI.    CONCLUSION

For the reasons stated above, Plaintiffs' Request for Judicial Notice is GRANTED and Defendants' Motion to Dismiss is GRANTED.

The Court GRANTS leave to amend the complaint, but only as to claims that are not governed by ERISA.

The Court further finds that:

Amendment as to any of the ERISA claims would be futile because the Plaintiffs already state facts in their complaint from which it can be reasonably inferred that:

(1) There were mathematical calculations or formulas that applied to each component to determine the severance payments for the post-takeover or post-merger severance plan.  These formulas were based on a variety of set and predetermined factors and applied to all terminated employees because of the 2022 and 2023 mass layoffs;

(2) After the takeover or merger, there were only cash payments promised.  There were no promises to continue healthcare benefits or outplacement services provided by a third-party and there were no eligibility determinations beyond being terminated;

And finally,

(3) The relevant plan is the severance plan that applied after the October 27, 2022 takeover.  Consequently, the complaint could not be amended to state a claim for violation of any earlier severance plans for which litigation risk and other factors may have been considered. Relatedly, communications were made by Defendants showing that the named Plaintiffs would no longer have access to the earlier plan, which was discontinued or modified greatly; as a result, both named plaintiffs would then have to overcome the threshold issue of constitutional standing.

Plaintiffs have 21 days from the date of this Order to file their Second Amended Complaint to state claims based on the deficient severance benefits offered or provided to terminated employees pursuant to the severance plan that applied due to the 2022 and 2023 mass layoffs.

Upon the filing of a sufficient complaint (stating non-ERISA claims for breach of contract, promissory estoppel, etc.), this Court will consider issuing an Order finding this case related to one of the cases currently pending, such as *Cornet*, No. 23-cv-00441-JLH.  Also related to *Cornet* are *Arnold*, No. 23-cv-00528-JLH-CJB and *Woodfield*, No. 23-cv-0780-JLH, both of which are pending in the District of Delaware.  If this action is found to be related to *Cornet*, then it can be transferred to the District of Delaware since the ERISA venue provisions will not apply once the SAC is filed with its non-ERISA claims.

This Order resolves ECF Nos. 38 and 47.

Consequently, ECF Nos. 24, 67, 79, 83 are moot.

ECF Nos. 95 and 96 will be addressed separately.

**IT IS SO ORDERED.**

Dated: July 9, 2024

_____
TRINA L. THOMPSON
United States District Judge

United States District Court
Northern District of California